**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **MILACRON INC., a Delaware corporation,** Debtor[1] | **Case No. 09-_____ (    )** |
| **Employer Tax I.D. No.  31-1062125** | |
| **In re:** | **Chapter 11** |
| **CIMCOOL INDUSTRIAL PRODUCTS INC., a Delaware corporation,** Debtor | **Case No. 09-_____ (    )** |
| **Employer Tax I.D. No.  31-1681002** | |
| **In re:** | **Chapter 11** |
| **MILACRON MARKETING COMPANY, an Ohio corporation,** Debtor | **Case No. 09-_____ (    )** |
| **Employer Tax I.D. No.  31-0240580** | |
| **In re:** | **Chapter 11** |
| **MILACRON PLASTICS TECHNOLOGIES GROUP, INC., a Delaware corporation,** Debtor | **Case No. 09-_____ (    )** |
| **Employer Tax I.D. No.  31-1681007** | |
| **In re:** | **Chapter 11** |
| **D-M-E COMPANY, INC., a Delaware corporation,** Debtor | **Case No. 09-_____ (    )** |
| **Employer Tax I.D. No.  31-1453086** | |
| **In re:** | **Chapter 11** |
| **MILACRON CANADA LTD., an Ontario corporation,** Debtor | **Case No. 09-_____ (    )** |
| **Employer Tax I.D. No.  Ontario 1787230** | |
| **In re:** | **Chapter 11** |
| **MILACRON CAPITAL HOLDINGS B.V., a Netherlands corporation,** Debtor | **Case No. 09-_____ (    )** |
| **Employer Tax I.D. No.   808877203 Netherlands** | |

---

[1] The corporate headquarters address of the above-captioned Debtors is 4165 Half Acre Road, Batavia, Ohio 45103.

## DECLARATION OF DAVID E. LAWRENCE IN SUPPORT OF
## FIRST-DAY MOTIONS AND APPLICATIONS

I, David E. Lawrence, hereby declare:

1.      I am President and Chief Executive Officer of Debtors, Milacron Inc., Cimcool Industrial Products Inc., Milacron Marketing Company, Milacron Plastics Technologies Group, Inc., D-M-E Company, Inc. and Milacron Canada Ltd. and President of the sole shareholder of Debtor Milacron Capital Holdings B.V., which are collectively referred to herein as the "Companies" or the "Debtors."  I am familiar with the day-to-day operations, business affairs, books and records of the Debtors.

2.      I submit this Declaration in connection with the voluntary chapter 11 petitions, first-day motions and applications of the Debtors in the above-captioned chapter 11 cases.  All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Debtors, upon information supplied to me by counsel to the Debtors, upon my review of relevant documents, or upon my opinion based on my experience and knowledge with respect to the Debtors' operations, financial condition and related business issues.  If I were called upon to testify, I could and would testify competently to the facts set forth herein, and am authorized to submit this Declaration on behalf of the Debtors.

3.      Part I of this Declaration describes the businesses of the Debtors and the relevant background preceding the filing of their chapter 11 petitions.  Part II of this Declaration sets forth the relevant facts in support of each first-day motion and application filed by the Debtors concurrently herewith.  I am familiar with the first-day motions and applications filed by the Debtors.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the respective first-day motion or application.

# I. BACKGROUND

## A.     The Chapter 11 Filings.

4.     On the date hereof, the Debtors commenced these cases by the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Commencement Date"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their affairs as debtors in possession.  As of the date hereof, no creditors committee, trustee or examiner has been appointed in any of these chapter 11 cases. The Debtors are seeking procedural consolidation and joint administration of their chapter 11 cases.

## B.     The Debtors' Background and Current Business Operations

**The Debtors' Business**

5.     In the 1860s, the predecessor to the Debtors opened as a small machine shop in downtown Cincinnati.  It soon began focusing on building milling machines and other machinery and, over the course of the next six decades, became the largest machine tool builder in the U. S. In the late 1960s, the Company entered the plastics machinery business by introducing its first line of injection molding machines.  In 1983, Milacron Inc. was incorporated under the laws of the state of Delaware.

6.     Today, Milacron Inc., through its direct and indirect subsidiaries and affiliates around the world (collectively, "Milacron"), is a major solutions provider to the plastics-processing industries and a leading supplier of premium industrial fluids to the metalworking industries.  Milacron delivers advanced technology and superior aftermarket service with a focus on the success of its customers worldwide.  Milacron's customer base is diversified with plastics customers in industries as wide-ranging as automotive, consumer goods, housewares, building materials, packaging, medical, and electronics.   Fluid customers include the automotive,

industrial components and machinery, aerospace, appliances, HVAC, oil and primary metals, and off-road equipment industries.

7.     Milacron's annual net sales for 2008 were approximately $788 million worldwide. Of this amount, the Debtors' net sales were approximately $468 million or 59%. The business structure is divided into two primary business lines: plastics technologies, which includes machinery and mold technologies, and industrial fluids.

8.     *Plastics Technologies:*  Milacron is one of the world's broadest-line suppliers of machinery, mold bases and related tooling and supplies to plastics processing industries. The Company's extensive applications engineering expertise and comprehensive aftermarket service and support differentiate it from its competitors. It provides injection molding machinery and systems, parts and services as well as blow molding and extrusion systems, parts, molds and services through its North American, European and Asian subsidiaries. Milacron also provides mold technologies, products that include mold bases, hot runner systems and related components, tooling and services worldwide as well as maintenance, repair and operating supplies for the plastics industry. The Debtors operate nine plastics production facilities throughout Ohio, Michigan, Pennsylvania, Kansas and Canada.

9.     *Industrial Fluids*:  Milacron's industrial fluids segment provides metalworking industries worldwide with a variety of coolants, lubricants, forming fluids, process cleaners and corrosion inhibitors used in the shaping of metal products. Milacron is able to provide value to its customers by helping them maintain the safety and effectiveness of their fluids and by offering them expertise in fluid/operation synergies to optimize their metalworking processes. Fluid optimization can provide customers with significant productivity gains and cost savings. The Debtors' industrial fluids operations are based in Cincinnati and Michigan.

**Organizational Structure**

10.     Milacron Inc. is the parent company of a multi-national organization with operations in 30 countries located throughout North America, South America, Europe, Asia, Australia and Africa. The Debtors include Milacron Inc., which is the parent company of six direct subsidiaries, including five Debtors: Milacron Plastics Technologies Group Inc. ("Milacron Plastics"), D-M-E Company ("D-M-E"), Cimcool Industrial Products Inc. ("Cimcool"), Milacron Marketing Company ("Milacron Marketing") and collectively with Milacron Plastics, D-M-E and Cimcool (the "U.S. Subsidiary Debtors") and Milacron Capital Holdings, B.V. ("MCH B.V."). Milacron Marketing, in turn, is the direct parent of Debtor Milacron Canada, Ltd. ("Milacron Canada").

11.     Milacron employs approximately 3,000 people on a consolidated basis worldwide. The Debtors' operations have historically accounted for approximately 50% of the total company employment, and currently the Debtors' employment stands at approximately 1,500.

12.     The current organizational structure of the Debtors is the result of a consolidation of the North American entities, which was completed at the end of 2008. Prior to the consolidation, there were approximately fifteen entities within the United States and six in Canada. The prior entities included: Nickerson Machinery Chicago Inc. (IL), Northern Supply Company, Inc. (MW), Pliers International, Inc. (DE), D-M-E Manufacturing Inc. (DE), and D-M-E U.S.A. Inc. (MI), which were each consolidated into Debtor D-M-E Company Inc.; Oak International, Inc. and Milacron Industrial Plastics Inc. (MI), which were consolidated into Debtor Cimcool Industrial Products, Inc.; Uniloy Milacron U.S.A. Inc. (MI), which was merged into Debtor Milacron Marketing Company (DE), and D-M-E of Canada Ltd., 450500 Ontario

Limited (Canada), Ontario Heater & Supply Company 328650, Rite-Tek 2913607, and Progress Precision, which were each amalgamated with debtor Milacron Canada as the surviving entity.

**Debt Structure**

<u>Asset Based Revolving Facility</u>

13.     On December 19, 2006, Milacron and its U.S. subsidiaries, including Debtors Milacron Plastics, D-M-E, Cimcool and Milacron Marketing (collectively, the "Borrowers") entered into that certain Credit Agreement with General Electric Capital Corporation ("GE Capital") as administrative agent, and the lenders from time to time parties thereto (the "Revolver Lenders") (as amended, supplemented, or otherwise modified as of the Commencement Date, the "Revolver Credit Agreement" and together with all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Revolving Financing Documents").  Debtors MCH B.V. and Milacron Canada are guarantors of the Borrowers' obligations under the Revolver Credit Agreement.   The Revolver Credit Agreement sets forth the terms and conditions of a five-year asset-based revolving loan facility (the "Revolver Facility"), wherein the lenders thereto agreed to lend to the Borrowers up to a maximum $105 million, subject to certain minimum availability thresholds, as described below.

14.     The security underlying the Revolver Facility consists of a first priority security interest, subject to permitted liens, in, among other things, U.S. and Canadian accounts receivable, cash and cash equivalents, inventory, and, in the U.S., certain related rights under contracts, licenses and other general intangibles, subject to certain exceptions.  The Revolver Facility is also secured by a second priority security interest on the assets that secure the 11½ % Senior Secured Notes due 2011 (as discussed below) on a first priority basis, and a pledge of 100% of Milacron's stock in the U.S. Subsidiary Debtors, 65% of Milacron's stock in Debtor

6

MCH B.V., and 65% of Milacron Marketing Company's stock in Milacron Canada, Uniloy Milacron Machinery-Mexico, S.A. de C.V., and Uniloy Milacron Services-Mexico, S.A. de C.V.

15.     The availability of funds under the Revolver Facility is generally limited to a borrowing base formula equal to specified percentages of eligible U.S. and Canadian accounts receivable and U.S. inventory, as well as permitted overadvances.  The funding is subject to other conditions to borrowing and limitations.  The Revolver Facility has a stated maturity of December 19, 2011.

16.     The terms of the Revolver Facility impose a daily cash "sweep" on cash received in the Debtors' U.S. bank accounts from collections of accounts receivable.  This daily sweep is automatically applied to pay down any outstanding borrowings under the Revolver Facility.  The administrative agent is authorized, at its option and at any time, to impose an additional sweep upon the cash received in Milacron Canada's bank accounts from collections of accounts receivable.  As a result of the sweep of all cash from accounts receivable, the Debtors rely on borrowings under the Asset Based Facility as their primary source of cash for use in their North American operations.

17.     As of the Commencement Date, the Debtors had outstanding obligations under the Revolver Facility of approximately $37.2 million plus outstanding letters of credit of $7.5 million.    On March 6, 2009, the Revolver Facility was amended pursuant to the First Amendment to Revolver Credit Agreement (the "Revolver Credit Agreement Amendment"), under which the Revolver Lenders agreed, among other things, to a release of reserves under the Revolver Facility that had the effect of increasing the Company's borrowing thereunder in exchange for an interest rate adjustment and certain other changes.  The First Amendment to

Revolver Credit Agreement provided for the forbearance from the exercise of any enforcement rights or remedies against MCH B.V.

Senior Secured Notes

18.     On March 26, 2004, Milacron Escrow Corporation, which was merged with and into Debtor Milacron on June 10, 2004, issued face value of $225 million in 11½% Senior Secured Notes Due 2011 (the "Senior Secured Notes" and any holder thereof, a "Noteholder"), pursuant to that certain indenture (the "Indenture" and collectively with all documents related thereto, the "Secured Notes Documents"), with U.S. Bank National Association as the indenture trustee (the "Indenture Trustee").

19.     Pursuant to the terms of an Inter-Creditor Agreement entered into by and between the Indenture Trustee and JP Morgan Chase Bank as the former agent under the Revolver Facility and the Supplement to Intercreditor Agreement entered into by GE Capital as the replacement agent under the Revolver Facility, the Senior Secured Notes are secured by a first priority security interest in the U.S. and Canadian Debtors' assets other than those securing the Revolver Facility on a first priority basis, and a second priority security interest in all of the assets securing the company's Revolver Facility on a first priority basis.  Milacron also pledged 100% of Milacron's stock in the U.S. Subsidiary Debtors, 65% of Milacron's stock in Debtor MCH B.V., and 65% of Milacron Marketing Company's stock in Milacron Canada, Uniloy Milacron Machinery-Mexico, S.A. de C.V., and Uniloy Milacron Services-Mexico, S.A. de C.V., which pledges have priority over the pledge of said stock in favor of GE Capital.  In addition to the security, the Senior Secured Notes were guaranteed on a senior secured basis by each of the U.S. and Canadian Debtors and on a senior unsecured basis by MCH B.V.

20.     As of December 31, 2009, the Debtors had obligations of principal and interest on the Senior Secured Notes of $222,716,163.

<u>Other Debt Obligations</u>

21.     In addition to the Revolver  Facility and the Senior Secured Notes, the Debtors' only other debt obligation is a capital lease for their manufacturing and headquarters facility in Afton, Ohio.  The aggregated amount outstanding under the capital lease was $4.8 million as of December 31, 2008, and principal payments of $1.6 million are payable in 2009.

22.     Certain of Milacron's European subsidiaries and other joint ventures organized outside of the United States have additional short and long term obligations including a five-year, asset based revolving credit program in Europe, various lines of credit and other borrowings and one capital lease.  None of these debt obligations are cross-defaulted with any debt of the Debtors, and none of the Debtors are obligors or guarantors, with the exception of Milacron, Inc. which has executed a guaranty in favor of Locafit; Locafit and Uniloy Milacron SRL are parties to that certain Contratto Di Locazione Fianaizra (Leasing) Immobiliare.

**Equity Structure**

23.     Milacron has three classes of stock: 4% Cumulative Preferred Stock, 6% Series B Convertible Preferred Stock, and Common Stock.  As of December 31, 2008, Milacron had outstanding 6,000 shares of 4% Cumulative Preferred Stock having a liquidation preference of $1,000 per share, plus accrued and unpaid dividends.  In addition, Milacron had outstanding 452,000 shares of 6% Series B Convertible Preferred Stock ("Series B Preferred Stock") having a liquidation preference of $200 per share and convertible, at the option of the holders, into an aggregate of approximately 5.2 million shares of common stock.  Covenants in the Senior

Secured Notes precluded the Company from paying cash dividends required to the holders of the Series B Preferred Stock for the last several years.

24.     As of December 31, 2008, Milacron had 6,109,320 outstanding shares of common stock ("Common Stock"), which includes 76,111 treasury shares.  The Common Stock is currently traded on the Pink Sheets electronic OTC market under the symbol MZIA.PK.

**Events Leading to Filing**

25.     As with many businesses in the current economic times, the Debtors were negatively impacted by high oil and resin prices in 2007 and 2008, by the shakeout among auto parts molders servicing the U.S. Big Three auto manufacturers, by major reductions in capital expenditures in the manufacturing sector worldwide, as well as the slowdown in residential home building.  As the world economy has slowed and the availability of credit has collapsed, Milacron has been drastically affected.

26.     In recent months, the deterioration in global economic conditions has resulted in a sharp decline in Milacron's sales and orders for its products and services.  The resulting shrink in Milacron's accounts receivables and inventory progressively reduced the borrowing base under the Asset Based Facility, the primary source of cash to fund Milacron's operations, to the point that by the end of February 2009 Milacron faced a severe liquidity crisis.

27.     Facing the potential liquidity crunch, Milacron concluded that a restructuring of its debts and other obligations had become necessary and retained advisors to assist in evaluating possible alternatives.  Milacron began discussions with Avenue Investments, L.P. and certain of its affiliates (collectively, "Avenue") and DDJ Capital Management LLC and certain of its affiliates (collectively, "DDJ" and together with Avenue, the "Initial Sponsors") regarding the Initial Sponsor's interest in providing ongoing financing to the Debtors and/or their interest in

participating in a possible restructuring. Initial Sponsors expressed interest in providing debtor in possession financing to Milacron as a bridge to the execution of an Asset Purchase Agreement and ultimate purchase of substantially all of Milacron's assets. Following an extensive search for alternative sources of financing and finding little interest in the marketplace, the Debtors engaged in substantial, arms-length negotiations with Initial Sponsors, which reached the first milestone, with the signing of a Restructuring Support Agreement ("RSA") and DIP Commitment Letter (the "DIP Commitment Letter"), which were each entered into by and between the Debtors and the Initial Sponsors. The Initial Sponsors' collectively hold approximately 78% of Senior Secured Notes.

28.     Concurrently with the negotiations with the Initial Sponsors, the Debtors began discussions with GE Capital regarding GE Capital's interest in providing debtor-in-possession financing.

29.     On March 10, 2009, Milacron and the Initial Sponsors entered into the RSA and the DIP Commitment Letter. Under the DIP Commitment Letter, the Initial Sponsors have agreed to provide an $80 million debtor in possession superpriority term loan facility (the "DIP Term Loan Facility"). The DIP Term Loan Facility will provide $40 million in funds available for business expenses with the other $40 million used to purchase, on a dollar-for-dollar basis, Senior Secured Notes owned by the Initial Sponsors and any other party which may participate in the DIP Term Loan Facility (collectively with the Initial Sponsors, the "DIP Term Loan Lenders"). The Initial Sponsors will invite holders of Senior Secured Notes that are not Initial Sponsors to participate in the DIP Term Facility on a pro rata basis.

30.     In addition to the DIP Term Loan Facility, on March 10, 2009, the Debtors obtained post-petition financing up to the principal amount of $55 million (inclusive of a $15

million sublimit for letters of credit) under which the outstanding obligations due under the Revolver Facility , including existing secured loans and letters of credit will be converted into a post-petition superpriority secured loan (the "DIP Revolving Facility" and together with the DIP Term Loan Facility, the "DIP Facilities") from GE Capital, as administrative agent and a lender, GE Capital Financial Inc., as issuing bank, and the other lenders from time to time parties to the DIP Revolving Facility Agreement (collectively, in their lender capcity, the "DIP Revolver Lenders", and together with the DIP Term Loan Lenders, the "DIP Facility Lenders").[2]

31.    The RSA sets forth a non-binding agreement in principle whereby a company formed by the Initial Sponsors (the "Purchaser") would purchase substantially all of the assets of the Debtors.  This agreement-in-principle is subject to certain conditions, including the execution and delivery of a mutually satisfactory definitive asset purchase agreement no later than April 9, 2009.  The Debtors will file a Bid Procedures Motion upon the execution of a definitive agreement with the Purchaser.  The Debtors will then solicit competing bids from other potential purchasers and conduct an auction.  The Debtor's assets would then be sold to the bidder submitting the highest and best offer, subject to Bankruptcy Court approval.

**Financial Performance**

32.    In the fourth quarter of 2008 and into 2009, Milacron Inc.'s North American operations were significantly impacted by the global recession. Global demand has meaningfully fallen, resulting in reduced manufacturing levels. With capacity utilization at historical lows, North American operations have experienced a substantial reduction in new orders and sales in both the Plastics Technologies and Industrial Fluids product segments. Despite aggressive cost reduction, and ongoing capacity rationalization over the past several years, severely reduced

---

[2] Notwithstanding any provision to the contrary contained within this Motion or any Order entered with respect to this Motion, in the case of a conflict, the provisions of the DIP Facilities shall govern.

sales and orders in recent months--precipitated by the ongoing credit crisis and deteriorating global economic conditions--have impacted liquidity to the point that Milacron has voluntarily filed for Chapter 11 protection in the Southern District of Ohio in Cincinnati and an ancillary proceeding in Canada. The filings enable Milacron to implement the restructuring and continue to operate its business in the normal course.

33.     Although we are hopeful that the North American and global economic environment will improve, our current outlook for 2009 reflects the continuation of the current recessionary environment through the end of the year.  Our projections also reflect perceived uncertainty surrounding the business impact of the Chapter 11 process, particularly at the outset. Taking all of these factors into account, we are forecasting 2009 North American sales of $300.9 million, a decline in sales of 36% from preliminary unaudited 2008 results[3]. This forecast does not reflect the possible discontinuation of a distribution arrangement that accounts for approximately 5% of the total sales and 10% of the gross profit for 2009.

---

[3] 2008 Financial results are preliminary, unaudited and subject to change.

**North American Operations (Including Corporate Overhead)**
*2009 Income Statement Forecast*

| (Dollars in millions) | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| New orders | $ 72.4 | $ 78.1 | $ 77.5 | $ 81.0 | $ 309.1 |
| Total sales | 68.1 | 75.6 | 76.1 | 81.0 | 300.9 |
| External cost of sales | 63.1 | 66.5 | 67.1 | 69.7 | 266.5 |
| Gross profit/mfg income | 4.9 | 9.1 | 9.0 | 11.3 | 34.4 |
| % of Sales | 7.3% | 12.1% | 11.8% | 14.0% | 11.4% |
| S,G&A expense & other | 14.8 | 14.8 | 14.4 | 14.7 | 58.6 |
| Operating earnings/(loss) (1) | (9.8) | (5.6) | (5.4) | (3.4) | (24.2) |
| Chapter 11 expense (2) | 6.8 | 8.5 | 1.9 | (0.7) | 16.6 |
| Net interest expense (3) | 8.4 | 10.4 | 10.8 | 10.8 | 40.4 |
| Tax provision | - | - | - | - | - |
| Net income/(loss) (1) | $ (24.9) | $ (24.6) | $ (18.1) | $ (13.5) | $ (81.2) |
| Adjusted EBITDA (4) | $ (5.7) | $ (1.5) | $ (1.3) | $ 0.9 | $ (7.5) |

**Notes:**
\*\*Assumes Chapter 11 exit in August 2009; however does not reflect potential exit costs.
(1) Includes $9.5 million of non-cash pension expense ($8.0 million in cost of sales and $1.5 million in SG&A).
(2) Excludes freight and utility deposits and critical and foreign vendor payments.
(3) Includes accrued interest of approximately $26.0 million.
(4) Adjusted for non-cash pension expense.

34.     At forecasted sales of $300.9 million, operating earnings are forecasted to be $(24.2) million in 2009. It should be noted that 2009 operating earnings includes non-cash pension expense of $9.5 million for the defined benefit pension plan for certain U.S. employees and retirees which is mainly due to a reduction in the market value of pension plan assets during 2008 that occurred as a result of a deterioration of the investing and economic climate. Additionally, the North American results include the entire cost of the corporate overhead which serves the global organization. Taking into account both of these items, in addition to other non-cash items, operating cash flow from operations is projected to be positive in 2009.

35.     The 2009 forecast already reflects the benefits from aggressive cost reduction, and ongoing capacity rationalization over the past several years. These actions have helped Milacron

to substantially reduce overhead and lower its break-even point. Most notable of these actions include the following:

- Headcount reduction of 242 full time equivalents
- Employee benefit reduction related to elimination of 401K match and supplemental contributions and a reduction in expense relating to medical, dental and life insurance plans
- Rotating furlough and wage freezes
- Headquarters relocation and data center consolidation
- Other selling, general and administrative expense reductions including, but not limited to, a realignment of employee incentives, Sarbanes-Oxley and audit costs, and selling expense
- Aggressive working capital management

36.     Milacron Inc. will continue to identify and implement cost reduction actions throughout 2009, and looks forward to returning to profitability and continuing to service our customer base.

37.     *The forward looking statements above by there nature involve risks and uncertainties that could significantly impact operations, markets, products, and expected results, including the current ongoing credit crisis, deteriorating global economic conditions, the potential adverse impact of its Chapter 11 cases on the Company's operations and relationships with customers and suppliers and its ability to enter into and close a definitive asset purchase agreement with the Noteholder Group or another purchaser.  For further information please refer to the Cautionary Statement included in the company's most recent Form 10-Q on file with the Securities and Exchange Commission.  The Company disclaims any obligation to update such forward-looking statements.*

## II. FIRST-DAY MOTIONS

38.    The Debtors have requested various types of relief in "first-day" motions and applications (collectively, the "First-Day Pleadings") in order to minimize the adverse effects of the commencement of their chapter 11 cases on their business.   I believe that a critical and necessary element in successfully administering these chapter 11 cases is the approval of the Debtors' First Day Pleadings submitted concurrently herewith.   The factual background and support for each respective First Day Motion is set forth below.

### a) Motion of Debtors and Debtors In Possession for an Order Directing Joint Administration of Related Chapter 11 Cases

39.    By the above-referenced motion (the "Joint Administration Motion"), the Debtors seek entry of an order providing for the joint administration of the Debtors' chapter 11 cases.

40.    The seven companies that comprise the Debtors are related entities.   I am informed by counsel that the Debtors are affiliates within the meaning of section 101(2) of the Bankruptcy Code because debtor Milacron Inc. owns, directly and indirectly, 100% of its subsidiaries, Cimcool Industrial Products, Inc., Milacron Marketing Company, Milacron Plastics Technologies Group, D-M-E Company, Inc. and Milacron Capital Holdings, B.V.   Further, Milacron Marketing Company owns, directly and indirectly, 100% of the stock of its subsidiary, Milacron Canada Ltd.

41.    I am informed by counsel that the joint administration of the Debtors' cases will facilitate and promote an economically efficient administration of these cases, permit the Clerk of the Court to utilize a single general docket for these cases, and combine notices to creditors of the Debtors' respective estates and other parties in interest which will result in substantial cost savings to the estates.

42.     I am further informed by counsel that, if joint administration is ordered, the Debtors, the Court, creditors and other parties in interest will be able to avoid incurring considerable unnecessary time and expense in connection with, among other things, the need to file duplicative motions, enter duplicative orders, and forward duplicative notices to creditors and other parties in interest.

43.     Because these cases involve seven Debtors with thousands of potential creditors, I have been informed by counsel that the entry of an order of joint administration will: (a) significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court; (b) render the completion of various administrative tasks less costly; and (c) minimize the number of unnecessary delays associated with the administration of numerous separate chapter 11 cases.  Consequently, I believe and submit that the joint administration of these chapter 11 cases is in the best interest of the Debtors, the Debtors' estates, their creditors and other parties in interest.

**b) Motion of the Debtors and the Debtors in Possession for an Order Establishing Certain Special Notice, Scheduling, Case Management and Administrative Procedures Pursuant to Rules 2002 and 9007 of the Bankruptcy Rules**

44.     Under the above-referenced motion (the "Case Management Motion"), the Debtors seek an order of this Court, establishing notice provisions, and scheduling and hearing requirements and procedures.  Specifically, the Debtors request that the Court enter an order: (i) establishing procedures for scheduling hearings, (ii) limiting notice in the above-captioned chapter 11 cases, (iii) designating the parties upon whom certain notices must be served by approving and establishing a Special Notice List (as defined in Exhibit A attached to the Case Management Motion), (iv) establishing the manner of service with respect to all matters for which the Bankruptcy Code and the Bankruptcy Rules authorize the Court to designate or limit

the parties entitled to notice and the manner of service, and (v) authorizing electronic service of documents.

45. I believe the relief requested by the Case Management Motion is necessary to ensure the efficient administration of these chapter 11 cases while ensuring that all parties with significant interests in these proceedings have an opportunity to be heard.

46. The procedures described in the case management procedures attached to the Case Management Motion (as may be modified or amended, the "Case Management Procedures") will (a) be distributed by the Debtors to all entities on the Special Notice List (as defined in the Case Management Procedures); (b) be available from the Debtors' counsel upon request; and (c) be included on the website of the Debtors' Claims Agent, Kurtzman Carson Consultants, at: **http://www.kccllc.net/milacron**. In the event that a modification or amendment is made to the Case Management Procedures, the revised Case Management Procedures shall be sent by the Debtors to all parties on the Special Notice List.

47. I believe that, for several reasons, it is necessary and appropriate to adopt the procedures proposed in the Case Management Motion. First, providing notice of all matters in these cases to all of the parties who would otherwise be entitled to notice would actually delay the provision of notices in these cases and would be unjustifiably burdensome and uneconomical. It would also place an enormous administrative burden on the Debtors' estates and would impede the consummation of transactions, negotiation of settlements and the granting of other relief that may be advantageous to the estates and their creditors. Furthermore, providing notice of all matters to all of the entities otherwise entitled to notice of such matters would unnecessarily increase the costs of administering these cases and, in many instances, delay service to these institutions.

48. With respect to the hearing procedures, counsel has informed me of the high volume of pleadings which will be filed in these cases. Consequently, I believe that the relief requested is necessary. I have been informed by counsel that the special hearing procedures will help organize the docket and will permit regularly scheduled hearings at which the Court may address multiple matters in an efficient manner, thereby minimizing the burden on the Court and time and expense to the Debtors' estates and other parties in interest. The proposed hearing procedures will also provide certainty to all parties as to when motions and applications must be filed to be heard at Omnibus Hearings. Based on the above, I believe that the proposed notice procedures will mitigate the administrative burden that would otherwise be imposed upon the Debtors' estates without diminishing creditor participation.

**c) Motion of Debtors and Debtors in Possession for an Order Granting Extension of Time for Filing Schedules and Statements**

49. By the above-referenced motion (the "Extension Motion"), the Debtors seek entry of an order extending time to file their schedules of (a) assets and liabilities; (b) current income and expenditures; (c) executory contracts and unexpired leases; and (d) statement of financial affairs.

50. Because of (a) the substantial size and scope of the Debtors' businesses; (b) the complexity of their financial affairs; (c) the limited staffing available to perform the required internal review of their accounts and affairs; and (d) the press of business incident to the commencement of these chapter 11 cases, the Debtors were unable to assemble, prior to the Commencement Date, all of the information necessary to complete and file the Schedules and Statements.

51. Given the urgency with which the Debtors sought chapter 11 relief and the more critical and weighty matters that the Debtors' limited staff of accounting and legal personnel

must address in the early days of these cases, the Debtors will not be in a position to complete the Schedules and Statements by the date required by Bankruptcy Rule 1007. Completing the Schedules and Statements for each of the Debtors will require the collection, review and assembly of information. Nevertheless, recognizing the importance of the Schedules and Statements in these chapter 11 cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances. Accordingly, I believe and submit that a 45 day extension of time to file the Debtors' Schedules and Statements (for a total of 60 days) is necessary and appropriate.

52.     While I believe that the requested extension should be sufficient to permit the Debtors to complete and file their Schedules and Statements, the Debtors request that any extension granted by the Court at this time not constitute a waiver of the Debtors' right to request additional extensions if warranted by the circumstances.

**d)  Motion of the Debtors and Debtors in Possession for an Order (A) Scheduling Expedited Hearings on Certain First Day Motions and (B) Approving Form and Manner of Notice Thereof**

53.     By the above referenced motion (the "Expedited Hearing Motion"), the Debtors seek entry of an order (i) scheduling an expedited hearing on the First Day Pleadings and (ii) approving the form and manner of notice of the expedited hearing. Contemporaneously with the commencement of these chapter 11 cases and the filing of this Declaration, the Debtors filed, among other things, the First Day Pleadings.

54.     I believe that the First Day Pleadings involve matters that require emergency and expedited hearings. As described in detail in each of the First Day Pleadings, the relief requested is essential to obtain financing and to maintain the Debtors' operations and businesses throughout these chapter 11 cases, as well as to administer these cases efficiently. The First Day Pleadings are of the type heard on an emergency or expedited basis, and any delay in authorizing the

requested relief could have a severe and irreparable effect on the Debtors' operations and their transition into chapter 11.

55.     Although the Debtors seek the scheduling of a hearing on the First Day Pleadings on the Commencement Date, and therefore without notice, prior to the filing of their chapter 11 petitions the Debtors provided electronic copies of the First Day Pleadings to (i) Milacron, Inc., 4165 Half Acre Road, OH 45103 (Attn: Hugh C. O'Donnell); (ii) Dinsmore & Shohl LLP, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202 (Attn. Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), Tim J. Robinson, Esq. (tim.robinson@dinslaw.com) and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtors; (iii) Shearman & Sterling, 599 Lexington Avenue, New York, NY 10022 (Attn: Michael Torkin, Esq. (mtorkin@shearman.com) and Solomon Noh, Esq. (solomon.noh@shearman.com) and Squire Sanders & Dempsey LLP, 221 E. Fourth St., Suite 2900, Cincinnati, Ohio 45202-4098 (Attn: P. Casey Coston, Esq., (ccoston@ssd.com)) counsel to the DIP Term Lenders; (iv) Paul, Hastings, Janofsky & Walker LLP, 600 Peachtree St., N.E., 24th Flr., Atlanta, Georgia 30308 (Attn: Jesse H. Austin III, Esq. (jessaustin@paulhastings.com) and J. Craig Lee, Esq. (craiglee@paulhastings.com) and Frost Brown Todd LLC, 201 E. Fifth St., Suite 2200, Cincinnati, Ohio 45202 (Attn: Ronald E. Gold, Esq. (rgold@fbtlaw.com)) counsel to GE Capital; (v) Shipman and Goodwin LLP, One Constitution Plaza, Hartford, CT 06103-1919 (Attn: Ira Goldman, Esq. (igoldman@goodwin.com) and Marie Pollio, Esq. (mpollio@goodwin.com)) counsel to the Indenture Trustee; (vi) the Office of the United States Trustee, Southern District of Ohio, 36 East Seventh St., Suite 2030, Cincinnati, OH 45202 (Attn: Monica Villarejos Kindt, Esq. (monica.kindt@usdoj.gov)); (vii) holders of the 40 largest

unsecured claims; and (viii) any governmental unit listed in LBR 5003-1(d) (collectively, the "Initial Master Service List").

56.     Accordingly, I believe an expedited hearing on the First Day Pleadings is warranted in these chapter 11 cases and further believe the form and manner of notice is appropriate as detailed in the Expedited Hearing Motion and the appropriate relief should be granted.

**e)  Emergency Motion of the Debtors and Debtors in Possession for an Order (A) Authorizing the Continued Use of the Debtors' Centralized Cash Management System and (B) Authorizing Maintenance of the Debtors' Existing Checks, Bank Accounts, and Business Forms; (C) Authorizing the Preservation and Exercise of Existing Intercompany Setoff Rights; (D) Authorizing, but not Directing the Debtors, in Their Discretion, to Pay Obligations Related to Intercompany Transactions for Goods Produced and Sold by Non-Debtor Affiliates; (E) Granting Administrative Priority Status for Post-Petition Intercompany Transactions; and (F) Waiving Investment and Deposit Requirements**

57.     By the above-referenced motion (the "Cash Management Motion"), the Debtors seek entry of an order authorizing them to: (a) continue use of their existing centralized cash management system, (b) maintain their existing checks, bank accounts, and business forms, (c) authorizing the preservation and exercise of existing intercompany setoff rights; (d) authorizing, but not directing the debtors, in their discretion, to pay obligations related to intercompany transactions for goods produced and sold by non-debtor affiliates; (e) granting administrative priority status for post-petition intercompany transactions; and (f) waiving investment and deposit requirements.  The Debtors seek this authorization to insure their orderly entry into bankruptcy and to help efficiently administer their businesses and avoid the disruptions and distractions that would inevitably divert the Debtors' attention from urgent matters during the initial stages of their bankruptcy cases.

**(i)     Maintenance of the Debtors' Existing Cash Management System**

22

58.     The Debtors believe that it is essential that the currently existing Cash Management System remain in place.  The Cash Management System enables the Debtors to: (a) control and monitor corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.  Given the general demands of the Debtors' reorganization process, I believe it would be unduly burdensome to require the Debtors to establish an entirely new system for the management of cash assets.  In contrast, preserving a "business as usual" atmosphere and avoiding the unnecessary distraction that inevitably would be associated with any substantial disruption of the Cash Management System will facilitate the Debtors' stabilization of its postpetition business and assist the Debtors' in its reorganization efforts.  I believe that if the Debtors are not permitted to continue to utilize the Cash Management System, its operations would be severely, and perhaps irreparably, disrupted.  Accordingly, I believe the Court should authorize the Debtors' continued use of the Cash Management System as described in the Cash Management Motion.

59.     The Debtors maintain 42 bank accounts (the "Bank Accounts") at 11 financial institutions (the "Banks") in the ordinary course of business.  The Bank Accounts include, without limitation, concentration, operating, controlled disbursement and deposit accounts.  A true and correct list of the Bank Accounts, including the Banks, each Bank's address and the last four digits of the account numbers, is attached to the Cash Management Motion as Exhibit A.

60.     The Cash Management System is an integrated system that provides well-established mechanisms for the collection, distribution, and management of funds used in the Debtors' business operating throughout the United States and Canada.  The flow of funds through the Bank Accounts is described below.

## Cash Collection

61.     The Debtors generate revenue primarily from sales of machinery, molding equipment, industrial fluids, and associated goods and services.   The monies generated from these business segments and services are deposited each day into various lockbox accounts according to business unit (the "Lockbox Accounts") maintained by PNC Bank and JP Morgan Chase.  The Debtors accept payments by wire and ACH electronic transfers as well as checks received upon delivery and via mail.  The Lockbox Accounts are swept daily to GE Capital, the Debtors' asset based lender.

## Disbursements

62.     On a daily basis, the Debtors calculate the funds required to pay their operating expenses, including material and component purchases, employee payroll and benefits, overhead expenses, taxes, and professional fees.  As needed to fund operations, the Debtors borrow funds from its asset based facility with GE Capital (the "GE Capital Account") and the funds are transferred to one concentration account.  Funds are then transferred by the Debtors into one of five concentration accounts (the "Concentration Accounts") or its travel reimbursement account. Funds transferred into the travel reimbursement account are used to reimburse employees for travel and related expenses, as necessary.  The funds transferred to the Concentration Accounts are then further transferred into one of several disbursement account (the "Disbursement Accounts").  The Disbursement Accounts include several accounts, separated by business unit, for general account payables (the "Account Payable Accounts"), payroll and benefits (the "Payroll Accounts") and for tax payment, workers' compensation and other similar types of non-customer directed payments.   Unused available funds in the Concentration Accounts are transferred daily back to the GE Capital Account.

## Miscellaneous Accounts

63.     The Debtors also maintain two business units with stand-alone cash management systems.  One business unit maintains a lockbox, disbursement and concentration account.  The second is a self-contained account that performs all functions for the associated business unit.  These business units are self-funding.  As the account balance reaches a certain level, the funds are transferred to a Concentration Account and subject to the daily sweep.

## Accounts of Milacron Canada Ltd. and MCH-BV

64.     Milacron Canada, Ltd., the Canadian debtor entity (the "Canadian Affiliate") maintains separate books and records from the U.S. Debtor affiliates.  The Canadian Affiliate maintains 13 bank accounts divided by business unit and between U.S. and Canadian currency.  Each Canadian business unit operates its bank account independently.  Generally, customer receipts and supplier disbursements comprise the majority of the transactions.  The cash flow system is not subject to daily sweeps and transactions within and between accounts are completed on an as-needed basis.  In addition, MCH-BV maintains a United States based deposit account at PNC Bank.

## Intercompany Transactions With Debtor and Non-Debtor Affiliates

65.     In the past, the Debtors have provided loans to non-debtor affiliates and, in certain instances, Debtors were the recipient of funds loaned from non-debtor affiliates (the "Intercompany Debt Transactions").  Further, in the ordinary course of business, the Debtors regularly participate in transactions with non-debtor affiliates in which they purchase and sell goods for use in the manufacturing processes of the various entities or purchase, for resale, certain manufactured products (the "Intercompany Trade Transactions", and together with the Intercompany Debt Transactions, the "Intercompany Transactions").  As a result of the Intercompany Transactions, the Debtors books and records reflect prepetition obligations between Debtors and non-debtor affiliates.  By this Motion, the Debtors seek authority to setoff

prepetition obligations related to Intercompany Debt Transactions. The Debtors further seek authority, in their discretion, to pay for prepetition Intercompany Trade Transactions, if, in the exercise of the Debtors' business judgment, they deem the payment necessary and in the best interest of the Debtors' estates and other parties in interest. Finally, the Debtors seek the authority, in their discretion, to continue to participate in Intercompany Trade Transactions post-petition, in the ordinary course of business, and to treat obligations related thereto as super-priority administrative expenses subject and subordinate only to any superpriority claims granted pursuant to an Order of this Court and to statutory fees of the United States Trustee.

### (iii) Existing Checks, Bank Accounts, and Business Forms

66. The Debtors' business forms, letterhead and checks are all customized according to their ordinary business needs. Because of the expense and disruption that would be incurred by the formulation of new forms containing the designation "Debtors in Possession," the Debtors seek to continue to use their customized forms, checks, and letterhead during the course of their chapter 11 cases without placing the label "Debtor in Possession" on each separate check or form.

67. In addition, the Debtors seek a waiver of the requirement that new bank accounts be opened to replace all of the Debtors' existing Bank Accounts because such a requirement would unnecessarily disrupt the Debtors' business, impair their efforts to reorganize successfully and not provide any significant benefit to the Debtors' estates, their creditors or other parties in interest. It is critical to the continued operation of the Debtors' business and the preservation of the value of their assets that the existing cash management system and Bank Accounts continue to be utilized without disruption.

68. In the ordinary course of its business, the Debtors use many pre-printed correspondence and business forms. The nature and scope of the Debtors' business and the

numerous suppliers of goods and services require that the Debtors be permitted to continue using their existing pre-printed correspondence and business forms without alteration or modification. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession.

69. Furthermore, the filing of the Debtors' bankruptcy petitions will undoubtedly be publicized within the business community and place a strain on the Debtors' relationships with their customers, vendors and other creditors that are essential to their continued operations. If the Debtors are required to substitute new debtor in possession bank accounts for their existing Bank Accounts, these relationships will be further strained by the payment delays and confusion that would result from opening the new accounts. Consequently, I believe that it is imperative that the Debtors be permitted to continue using the existing Bank Accounts to avoid such unnecessary disruption of their business, efficiently administer their bankruptcy cases and devote their efforts to a successful reorganization. Although the Debtors seek authorization to utilize and retain their existing checks and bank accounts, the Debtors will maintain their books and records so as to provide a clear line of demarcation between prepetition and postpetition transactions and operations. The Debtors further represent that if the proposed relief is granted, they will not pay, and each of the Banks will be directed not to pay, any debts incurred before the Commencement Date, other than as authorized by this Court.

**f) Motion Debtors for Entry of an Order Under 11 U.S.C. §§ 105(A) and 366 (I) Preventing Utility Companies From Discontinuing, Altering, Refusing Service, (II) Establishing Procedures for Determining Adequate Assurances of Payment, and (III) Establishing Procedures for the Utility Companies to Opt Out of the Debtors' Proposed Procedures for Adequate Assurance**

70.     By the above referenced motion (the "Utilities Motion"), the Debtors seek entry of an order  (a) determining that their Utility Providers (as defined below) have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed procedures for Utility Providers to request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (d) establishing procedures for the Utility Providers to seek to opt out of the Debtors' proposed adequate assurance procedures; and (e) determining that the Debtors are not required to provide any additional adequate assurance, beyond what is proposed by the Utilities Motion, pending entry of a final order approving same.

71.     In connection with the operation of their businesses and the management of their properties, the Debtors purchase utility services (collectively, the "Utility Services") from various providers (collectively, the "Utility Companies").  Attached as Exhibit A to the Utilities Motion is a list of substantially all of the Utility Companies that were providing Utility Services to the Debtors as of the Commencement Date.[4]

72.     I believe that if the Utility Companies are permitted to terminate Utility Services on the thirty-first day after the Commencement Date, there will be severe disruptions in the Debtors' business affairs.  Further, to avert such harm, the Debtors would be required to pay whatever amounts are demanded by the Utility Companies to avoid the cessation of necessary Utility Services.

---

[4]  Although the Debtors have exercised their best efforts to list all of the Utility Companies on Exhibit A to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from such exhibit.  Accordingly, the Debtors request that any relief granted pursuant to this Utilities Motion apply to any

73.     If Utility Services to the Debtors' manufacturing, distribution, and administrative facilities were interrupted, the Debtors would no longer be able to operate their business, and could suffer irreparable harm.  Any loss of Utility Services could result in the loss of significant manufacturing capacity, and lead to irreparable harm to the Debtors relationship with customers, and the loss of goodwill in the marketplace.  Simply put, without the Utility Services, the Debtors' operations will shut down.

74.     The Debtors fully intend to pay all postpetition obligations owed to the Utility Providers in a timely manner.  Further, the Debtors expect that the Debtors' proposed debtor-in-possession financing will be more than sufficient to pay all postpetition utility obligations.

75.     The Debtors contract with Cass Information Systems, Inc. ("Cass") wherein Cass provides accounts payable, analysis reporting, and other data processing services to the Debtors with respect to the Debtors' relationship with their utility vendors.  Through this service, Cass receives the utility bills from the providers, reviews the invoices and coordinates with the Debtors' accounts payable group regarding payment.  Cass makes the payments from funds provided by the Debtors on a weekly basis.  Nothing in the agreement between the Debtors and Cass affects the direct relationship between the Debtors and the Utility Debtors.

76.     The Debtors propose to provide adequate assurance to the Utility Providers by making a deposit equal to two weeks of utility service, calculated as a historical average during the most recent calendar year, to each Utility Provider as interim adequate assurance (the "Adequate Assurance Deposit") within five business days of the first day hearing (the "First Day Hearing"), provided that such Utility Provider is not currently paid in advance for its services.

---

Utility Company that provides Utility Services to the Debtors, whether or not any such Utility Company is identified on Exhibit A to the Utilities Motion.

77.     I believe that the Adequate Assurance Deposit, in conjunction with the Debtors'
ability to pay for future utility services in the ordinary course of business (collectively, the
"Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility
Providers.

78.     In light of the severe consequences to the Debtors of any interruption in Utility
Services, but recognizing the right of Utility Providers to evaluate the Proposed Adequate
Assurance on a case-by-case basis, the Debtors are proposing procedures in the Utilities Motion
that will enable them to cooperatively work with the Utility Providers to consensually resolve
adequate assurance issues.  If the Debtors and a Utility Provider cannot consensually resolve
such issues, I am informed by counsel that the Court should determine first whether an additional
adequate assurance payment is necessary and, if so, how much it should be so that the Utility
Provider will not cease performance for failure of adequate assurance.  The procedures that the
Debtors propose to effectuate this result are set forth in detail in the Utilities Motion (the
"Adequate Assurance Procedures").   The Debtors believe it is prudent to require Utility
Providers to raise any objections to the Adequate Assurance Procedures so that such objections
may be heard by the Court before the running of the 30-day period following the
Commencement Date in order to avoid a potential hostage situation.

79.     Lastly, the Debtors have made an extensive and good faith effort to identify their
Utility Providers and include them on the Utility Service List.  Nonetheless, it is possible that the
Debtors have not yet identified or included certain Utility Providers on the Utility Service List.
To the extent that the Debtors identify additional Utility Providers, the Debtors will file
amendments to the Utility Service List, and shall serve copies of the Order on such newly

identified Utility Providers. The Debtors request that the order be binding on all Utility Providers, regardless of when such Utility Provider was added to the Utility Service List.

80. Based on the foregoing reasons, I believe and submit that an order granting the relief requested in the Utilities Motions is in the best interest of the Debtors, their estates, their creditors and any other parties in interest.

**g) Motion of the Debtors and Debtors in Possession for an Order (I) Authorizing , But Not Directing, the Debtors to (A) Pay Certain Prepetition Wages, Salaries, Bonuses and Other Compensation; (B) Continue Employee Benefits Programs in the Ordinary Course of Business; and (C) Pay Certain Reimbursable Expenses; (II) Authorizing, But Not Directing, the Debtors to Make Deductions From Employee Paychecks; and (III) Authorizing and Directing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing**

81. Under the above-referenced "Employee Motion", the Debtors seek the entry of an order (I) authorizing, but not directing, the Debtors to pay (a) prepetition wages, salaries, and other compensation; (b) employee medical and similar benefits; (c) reimbursable expenses; (II) authorizing, but not directing, the Debtors to make deductions from employees' paychecks; and (III) authorizing and directing banks and other financial institutions to pay all checks and electronic payment requests made by the Debtors in relation to the foregoing.

82. Currently the Debtors employ approximately 1,500 full-time employees at their 20 locations throughout Ohio, Pennsylvania, Michigan, Kansas, and Canada, as well as a significant number of part-time employees and independent contractors (the "Employees"). The Employees can be divided into four categories: (1) Non-exempt Employees under the Fair Labor Standards Act (the "FLSA"), (2) Exempt Employees under the FLSA, (3) full-time and part-time

employees in Canada (the "Canadian Employees"), and (4) various independent contractors and independent service providers (together the "Independent Contractors").[5]

83.     The Debtors' Employees perform a variety of critical functions, including manufacturing, sales, product development, administrative, accounting, supervisory, management and other tasks.  To operate during these chapter 11 cases, the Debtors must retain their Employees' skills and their knowledge and understanding of the Debtors' infrastructure, operations and customer relations.

84.     To do so, the Debtors seek to pay prepetition Employee-related obligations when due.  Nonpayment of Employee compensation and benefits could severely undermine morale and impose real hardship on the Employees and generate doubts about the stability of the Debtors and their operational prospects.

## I.     EMPLOYEE OBLIGATIONS

### A.     Unpaid Compensation

85.     The Debtors maintain multiple payment structures for various employees and locations, including monthly, bi-weekly, and modified billing cycles (collectively, a "Pay Period").  The Debtors average <u>weekly</u> gross compensation for Employees, including wages and salaries, is approximately $1,620,000 for U.S. Employees and $78,000 for Canadian Employees.[6]  The payroll is made by both direct deposit through electronic transfer of funds directly to the Employees' accounts and via checks made directly to the employee.

86.     As of the Commencement Date, the Debtors have not paid their Employees all prepetition wages, which are held in arrears and paid at the end of the Pay Period or shortly

---

[5] For purposes of this Motion, Employees that are not Canadian Employees are U.S. Employees, all of whom are employed as of the Commencement Date.  For the avoidance of doubt, none of the relief sought herein is applicable to persons not employed by any of the Debtors as of the Commencement Date.

thereafter.  Additionally, compensation may be due and owing as of the Commencement Date because:

  a.  some discrepancies may exist between the amounts paid and amounts Employees or others believe should have been paid, which upon resolution, may reveal that additional amounts are owed to such Employees;

  b.  there may have been difficulties in completing an electronic fund transfer into an Employee's account;

  c.  variations in the Debtors' various payroll records;

  d.  the Employee's checks may not have cleared the financial institution; and

  e.  unpaid obligations arising out of the agreements with various independent contractors.

87.     As the Debtors' payroll runs at multiple periods, all in arrears, the Debtors are asking for authority to pay such amounts owed, and are therefore estimating that, as of the Commencement Date, $1,625,000 for U.S. Employees and $80,000 for Canadian Employees will be outstanding, which consists of accrued wages, salaries, overtime pay, commissions, and other compensation (excluding reimbursable expenses, vacation pay, and incentive bonuses) earned prior to the Commencement Date.

88.     The numbers reflected herein are for the amounts accrued but where no check or other payment has been made.  The Debtors bi-weekly payroll was completed on Friday March 6, 2009 for the pay period ended February 28, 2009, and there are likely a number of checks that have not yet been deposited by the Employees. I believe it is necessary to continue to honor, in the ordinary course of business, any outstanding payroll checks for current employees.  I have been informed by counsel that Employees have a priority claim for up to $10,950 in pre-petition

---

[6] When periodic expenditures or expenses are split between U.S. Employees and Canadian Employees, the amounts shall be in United States currency for the U.S. Employees and Canadian currency for the Canadian Employees.

payroll obligations; however, the Debtors do not believe any individual is owed in excess of $10,950 for accrued but unpaid wages.

89. The Independent Contractors provide a wide range of services including but not limited to, sales, consulting, accounting, computer services, occupational health and other related functions. The average weekly cost for the Independent Contractors is approximately $75,000. The Debtors believe that all Independent Contractors have been paid in the ordinary course of business and therefore no individual Independent Contractor is owed more than $10,950.

90. I believe the sum of the pre-petition Employee Wages and Benefits is relatively minimal in amount when compared with the size of the Debtors' estates and the damage to the Debtors' chapter 11 cases that would ensue if Employee morale were disrupted by the Debtors' failure to meet their Employee Wages and Benefits obligations.

**B.      Remitting and Paying Appropriate Deductions and Withholdings**

91. During each Pay Period, the Debtors routinely deduct certain amounts from paychecks, including without limitation, (a) garnishments, child support, and similar deductions, (b) other pre-tax and after-tax deductions payable pursuant to certain employee benefits discussed herein (such as an Employee's share of health care benefits, insurance premiums, 401(k) contributions, legally ordered deductions and other miscellaneous deductions), as well as (c) deductions for individual insurance programs selected by the Employees such as flexible spending account and health savings account deductions (collectively, the "Deductions"), and forward those amounts to various third party recipients.

92. On average, each month, the Deductions total approximately $1,100,000 for U.S. Employees and $40,000 for Canadian Employees. However, due to the commencement of these chapter 11 cases, some of these Deductions may have been deducted from the Employees' earnings forwarded to the appropriate third-party recipients prior to the Commencement Date.

Accordingly, the Debtors seek authority to continue to forward these prepetition Deductions (which the Debtors hold in trust) to the applicable third party recipients on a post-petition basis, in the ordinary course of business, as routinely done prior to the Commencement Date.

93.     Further, the Debtors are required by law to withhold from their Employees' wages amounts related to federal, state, provincial, and local taxing authorities, including in Canada (the "Withheld Amounts").  On average, the Withheld Amounts total approximately $390,000 per week .  For U.S. Employees, the Debtors must match from their own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for state, provincial, and federal unemployment insurance (the "Employer Payroll Taxes"). The Employer Payroll Taxes for each week are approximately $365,000.

94.     Prior to the Commencement Date, the Debtors withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and reserved for the Employer Payroll Taxes.  However, due to these chapter 11 filings, the Payroll Taxes may not have been forwarded to the appropriate taxing authority.  As a result, the Debtors seek authority, at their discretion, to continue to honor and process the prepetition obligations with respect to the Payroll Taxes on a post-petition basis, in the ordinary course of business, as routinely done prior to the Commencement Date.

### C.     Honoring Reimbursable Expenses

95.     Prior to the Commencement Date, and in the ordinary course of business, employees incurred certain expenses on the Debtors' behalf, which include but are not limited to, meals, parking, automobile mileage and other business related expenses (the "Reimbursable Expenses").

96.     Employees use their personal funds to pay for the Reimbursable Expenses, and submit expense vouchers for approval.  The Employees are willing to use their own funds based

on the expectation and belief they will be reimbursed for these expenses by the Debtors. Upon approval of the expenses, the Debtors reimburse the Employees out of corporate funds. Reimbursable Expenses average approximately $386,000 per month.

97. To the extent any Employees incurred the Reimbursable Expenses, such expenses were incurred on the Debtors' behalf and in the scope of their employment, with the understanding that such expenses would be paid by the Debtors. Accordingly, the Debtors request authority, in their sole discretion, to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, (b) modify their prepetition policies relating thereto, and (c) pay all Reimbursable Expenses that relate to the prepetition period.

## II. EMPLOYEE BENEFITS

98. The Debtors provide Employees, in the ordinary course of business, with a number of Employee benefits designed to assist their Employees and their Employees' eligible dependents in meeting certain financial burdens, including those arising from illness, disability, and death (collectively, the "Employee Benefits"), including but not limited to: (a) medical and dental insurance; (b) workers' compensation insurance; (c) vacation time and other paid absences; (d) 401(k) savings plan; and (e) other miscellaneous employee benefits. The Debtors seek authorization, but not direction, to pay or otherwise continue to honor these Employee Benefits, as described herein.

### A. Medical and Dental Plans

99. The Debtors provide Employees medical insurance through the Milacron Welfare Benefit Plan which offers benefits though three self-funded administrative services contracts (the "Medical Plan"). The Medical Plan is administered through a third-party administrator, Aetna Insurance ("Aetna"). Aetna pays for the Medical Plans as necessary to the providers of the plans

(the "Medical Plan Providers"). The Debtors then reimburse Aetna for the costs and expenses through an electronic transfer of funds (the "Medical Payments").

100. The prescription program contained in the Medical Plan is also administered by Aetna. The Employees do not contribute a separate payroll deduction for prescription benefits but pay a co-pay administered through the Medical Plan.

101. In addition, the Debtors have historically maintained a "Stop Loss" insurance policy through their non-debtor affiliate, Milacron Assurance Ltd. ("MAL")[7], designed to protect the Debtors against excess claim losses on the self-insured Medical Plan (the "Stop Loss Policy"). When a medical claim arises, the Employee will be responsible for his or her applicable portion of the co-pay at the time of service or prescription purchase, and the Debtors pay the remainder of each claim event (including prescription claims) until total claims reach a lifetime maximum of $2,000,000 per Employee. Under the terms of the Stop Loss Policy through MAL, if claims incurred and paid during the policy year exceed $150,000, the amount in excess is a reimbursable claim against the Stop Loss Policy. Aetna pays the entirety of the Medical Payment and the Debtors reimburse Aetna for claims in their entirety. The Debtors then file a claim against the Stop Loss Policy for the amount in excess of $150,000. The annual cost of the Stop Loss Policy has been approximately $325,000.

102. Based on claims experienced for the prior stop loss period of January 1, 2008 through December 31, 2008, the costs of the Medical Plan and Stop Loss Plan, including administration fees and the Stop Loss Policy premium, is expected to total approximately

---

[7] In the days immediately preceding the filing of these Chapter 11 cases, the Debtors have been seeking, and where feasible, obtaining third party insurance to replace the insurance policies provided by MAL, as it appears likely that upon the filing of these bankruptcy cases, MAL will be deemed insolvent and likely to file an insolvency proceeding under the laws of Bermuda. The Debtors are still evaluating their need to replace the Stop Loss Policy, which will depend in part on their ability to obtain replacement insurance which will provide substantially similar benefits to the affected Employees with any reasonable modifications, as determined in the Debtors' sole discretion.

$9,200,000 in 2009. Of this amount, the Debtors' net cost, annualized, is expected to be approximately $6,400,000 and the Employees' contributions were approximately $2,800,000. Hence, the Debtors' net costs represent approximately 57% of the historical Health Plan costs when compared to contributions from Employees.

103.     Currently, the Debtors estimate that there is approximately $200,000 of accrued but unpaid, prepetition liabilities pertaining to the Medical Plan and seek Court approval to pay this amount in the ordinary course of business. Further, there may be Medical Payments that have not yet cleared the bank. The Debtors also request that such issued checks be permitted to be honored in the ordinary course of business.

104.     The Debtors also provide dental benefits through two self-funded dental administrative services contracts with Humana as the plan administrator and one fully-insured plan through Aetna (the "Dental Plans"). The average monthly cost of the Dental Plans is approximately $82,870, including administrative fees of approximately $4,800 per month. Employees' contributions equate to $71,163 and the Debtors' contributions total $11,707. Thus, the Debtors' contribution is approximately 14% of the overall cost of the plan. Currently, the Debtors estimate that there is approximately $22,000 of accrued but unpaid, prepetition liabilities pertaining to the Dental Plan, of which approximately $3,080 is the Debtors' responsibility, and seek Court approval to pay this amount in the ordinary course of business.

105.     Employees rely on the Debtors to provide continuing health care benefits. I believe Employee welfare, morale and expectations would be significantly harmed if the Debtors were to fail to pay any amounts due with respect to the Health Insurance.

106.     Furthermore, and for similar reasons, the Debtors seek to continue to provide continuation coverage under section 4980B of the Internal Revenue Code to administer

38

Continuation Health Coverage ("COBRA") (see 26 U.S.C. § 4980B) and to continue premium subsidies provided to certain former employees who may qualify as retirees under section 1114. The Debtors have contracted with Klais & Co. to administer their COBRA obligations.

107.    These premiums for the COBRA coverage are paid jointly by the Debtors.  On a monthly basis, Klais & Co. collects in the aggregate, approximately $2,200 from the Debtors to fund these COBRA premiums for those former employees enrolled in the COBRA program and receiving the Debtor provided COBRA subsidy.

108.    By the Employee Motion, the Debtors seek authority, in their sole discretion to: (a) continue the Health Insurance for their Employees in the ordinary course of business; (b) continue making contributions to the Medical and Dental Plans and obtain a replacement Stop Loss Policy; (c) pay any amounts related to the Health Insurance and the Employee Benefits, including any premiums, claim amounts and administrative fees, to the extent that such amounts remain unpaid on the Commencement Date; and (d) pay their COBRA obligations.

**B.    Workers' Compensation**

109.    Pursuant to state laws, the Debtors must maintain workers' compensation liability coverage in the ordinary course of business.  As noted, the Debtors employ  approximately 1,500 full-time Employees and a significant number of part-time employees and independent contractors at their operations throughout the United States and Canada.

110.    Outside of Ohio and the state of Washington, the Debtors are insured through The Travelers Companies, Inc., ("Travelers") with a large deductible plan ($500,000 per occurrence). In its capacity as administrator of the Insurance, Travelers pays claims as they come due and charge the amounts back to the Debtors on a monthly basis.  The Debtors pay a fixed cost and monthly premiums paid over the first 10 months of the policy period, April 1st to March 31st.

111.     Ohio law requires that employers with one or more employees obtain workers' compensation coverage through the state fund (the "State Fund") administered by the Bureau of Workers' Compensation ("BWC") or have BWC grant them the privilege of self-insurance for liabilities associated with work related accidents or occupational diseases.  The Debtors have been a self-insured status in Ohio since July 1, 1976.  Prior to that, the Debtors participated in the Ohio State Fund.  For Ohio employees, the Debtors use a third-party administrator, Sheakley Uniservice, to administer claims.  The Debtors pay semi-annual BWC assessments, BWC Disabled Workers Relief Fund payments, BWC Guaranty Fund, quarterly fees to Sheakley, and annual fees for excess workers' compensation insurance premiums to MAL and Arch Insurance Company,[8] and fees to Comp Management for medical case management work.  In the state of Washington, where the Debtors currently have two employees, the Debtors pay into the State Fund on a semi-annual basis.

112.     On average, the Debtors pay approximately $1,640,000 per year for their Workers' Compensation Program.  The Debtors believe they are current in prior payments of premiums on the Workers' Compensation Program; however, the Debtors' premiums may be adjusted for prior periods based on changes during those periods in the number of the Debtors' employees, payroll obligations and other factors such as claims history.

113.     By this Motion, the Debtors request authority to continue to maintain their Workers' Compensation Program in the ordinary course of business, and pay any prepetition amounts related thereto.

### C.     Vacation, Holiday and Paid Leave

**(i)     Vacation**

---

[8] Historically, the Debtors have had additional excess insurance through MAL, however, based on the circumstances as detailed in footnote 5 to this Motion, the anticipation is that upon the expiration of this policy, or the liquidation of MAL, the Debtors will not replace this excess insurance.

114. The Debtors provide vacation time to their Employees as a paid time-off benefit ("Vacation Time"). Vacation Time varies based on the respective Employee's years of service and position with the Debtors and business unit. Employees are paid at their regular hourly or salaried rates for Vacation Time.

115. Employees earn paid vacations based on their length of employment with the Debtors or contractual arrangement. Employees begin with two weeks of vacation in their first full year with the Debtors. Vacation is earned throughout the year on a pro-rata basis per pay period. To the extent they use the Vacation before it is earned, they are allowed to make it up over the rest of the year. As Employees advance in seniority, they are awarded additional time off, up to a potential maximum of 4 -6 weeks, depending on business unit. Typically, Employees are required to use their vacation during the 12 month period in which it was granted, except that: (1) in certain business units, Employees are permitted to roll over up to a week of vacation into the next cycle; and (2) those Employees with greater than four weeks of vacation are permitted to "bank" any part of their vacation beyond the fourth week. Prior to the Commencement Date, banked vacation could be used at any time or was paid out to Employees upon termination at their then rate of pay.

116. Currently, the Debtors estimate that there is approximately $3,350,000 of accrued but unpaid, prepetition liabilities pertaining to Vacation Time (including $2,000,000 in banked vacation) By this Motion, the Debtors seek Court approval to continue to permit Employees to accrue and use their vacation days in the ordinary course of business, without disruption. The Debtors do not seek the authority to pay, nor will the Debtors pay, any lump-sum payments of unused vacation time, whether banked or otherwise, during the pendency of these cases.

**(ii)     Holiday Pay**

117.     The Debtors provide regular full time Employees 10-12 paid holidays per year depending on location and business unit (the "Holiday Pay"). If a holiday falls on a weekend, Employees receive either the Friday before or the Monday following the holiday as an additional paid vacation day.   Holiday Pay is paid at straight time, including shift differential.   To be eligible for Holiday Pay, an Employee must not be out on leave (other than FMLA) that scheduled workday prior to and after the first scheduled workday after the holiday.

**(iii)     Paid Absence**

118.     The Debtors permit regular full-time non-exempt Employees to take limited paid time off throughout the year ("Paid Absences").   Managers have the discretion to award time under the policy.   The Employee's supervisor approves the first 24 hours of paid time off.   The next level of management must approve the next 16 hours.   Paid Absence does not carry over nor is there any payout of unused time.

**(iv)     Jury Duty Leave**

119.     Depending on business unit and location, many full-time Employees are eligible for jury duty leave.   The Debtors provide time off for jury duty, and most operations provide for full pay while an Employee is on jury duty.   Certain locations require the Employee to reimburse the Debtors for any pay received as a result of being on the jury and some locations do not provide any pay during jury duty.   The average monthly cost associated with the jury duty benefit is approximately $750.

**(v)     Funeral Leave**

120.     The Debtors offer Employees between one and three days of funeral leave for eligible family members.   The average monthly cost of providing funeral leave is approximately $3,700.

**(vi)    Temporary Military Leave**

121.    The Debtors provide up to two weeks of pay, less any amount of military pay, for full time Employees who are members of the National Guard or Reserves.  Employees that qualify for military leave are provided benefits in accordance with USERRA and other federal and state laws governing employees on military service.  In 2008, no Employees received pay under the temporary military leave program; however, approximately three Employees are currently covered.

122.    By this Motion, the Debtors request authority, in their sole discretion, to honor their , Holiday Pay and Paid Absence policies in the ordinary course of business and to permit Employees to use their Vacation Time in the ordinary course of business.

**D.    401(K) Savings Plan**

123.    The Debtors sponsor a defined contribution plan, or 401(k) Plan, intended to qualify under § 401 of the Internal Revenue Code of 1986, as amended, (the "Code").  Substantially all of the Debtors' Employees are eligible to participate in the 401(k) Plan on their first day of  employment (the "401(k) Plan").  Employees may direct their investments among various pre-selected investment alternatives.  Employee contributions to the 401(k) Plan vest immediately.  The Debtors suspended making matching contributions to the Employees' 401(k) accounts in 2008.  In addition, the Debtors previously provided an annual contribution outside of its matching funds as a basic contribution.  The basic contributions were also suspended in August 2008 and the 2008 obligation is unpaid.

124.    The Employees' contributions to the 401(k) Plan total approximately $390,000 per Pay Period.  Currently, the Debtors estimate that there is approximately $104,000 of accrued but unpaid, prepetition liabilities pertaining to the Employees' contributions to the 401(k) Plan.  Of course, the Employees' contributions to the 401(k) Plan are not property of the bankruptcy

estate, but constitute funds held in trust for the benefit of the Employees.  The Debtors request to continue the 401(k) Plan for Employees, at their sole discretion, and in the ordinary course of business and to remit any prepetition amounts withheld thereunder.

### E.  Miscellaneous Employee Benefits

### (i)  Employee Life and Personal Injury Insurance Benefit Programs

125.    In the ordinary course of business, the Debtors offer all Employees the opportunity to participate in employee-paid group term life insurance, group universal life insurance and personal injury insurance.  The costs of these programs are fully borne by the Employees that participate.  All administrative fees are included in the Employee's premium payments.

126.    The group term life coverage is provided by Aetna and Employees are able to elect coverage from one half times their salary to three times their salary.  Average monthly premium payments for the group term life insurance total approximately $27,500.  The group universal life coverage and personal injury insurance is provided by Cigna and Employees may elect personal, spouse, or child (for life only) coverage.  The average monthly premiums for group universal life and personal injury insurance are approximately $28,800.

127.    All costs of these insurance programs are borne exclusively by the Employee participants; however, payments are made through payroll deductions with the Debtors making the payments.  As a result, there may be accrued and outstanding amounts withheld from the Employees that have not yet been paid to Aetna or Cigna.  By this Motion, the Debtors seek the authority to honor that commitment to remit any payments that remain outstanding.

128.    In addition to the Employee life and personal injury insurance, corporate officers are provided supplemental life insurance coverage amounting to one times the officer's annual salary.  Premiums, which average approximately $2,360 per month are paid by the Debtor and

the tax on each participant's imputed income is grossed up and paid by the company. The Debtors hereby request the authority to continue the Employee life and personal injury insurance policies in the ordinary course of business.

**(ii)     Short and Long Term Disability Insurance Benefit Program**

129.    The Debtors provide short and long term disability insurance to all full time Employees. The short term disability insurance is self-funded and provides Employees for up to 80% of their weekly pay for up to 26 weeks. The amount of funding varies based on whether an Employee is exempt or non-exempt and the seniority of the Employee. Short term disability insurance is self-funded by the Debtors and, on average, 20 Employees are on short term disability at any given time. The Debtors pay approximately $48,500 on a monthly basis to cover the costs of short term disability.

130.    The Debtors also provide long-term disability insurance benefits equal to 40% of monthly earnings. Employees are also permitted to elect 60% coverage, where the Employee pays for the additional 20% coverage premium. Long term disability is administered by Aetna and the Debtors average monthly contributions are approximately $11,300. Employees contribute approximately $14,800 per month for total monthly premiums of $26,100.

131.    By this Motion, the Debtors request the authority to maintain the short and long term disability programs and to continue to pay prepetition expenses related to the disability programs. In relation to the overall payroll obligations of the Debtors and the negative impact withholding payment would have on the affected Employees, it is in the best interest of the company to maintain the disability insurance programs.

**(iii)    Automobile Program**

132.    For Employees who require transportation as part of their employment and certain members of management, the Debtors lease approximately 250 vehicles for use by Employees.

The Debtors lease cars through PH&H Vehicle Management Services, LLC ("PHH"). The Employees are also provided with a PHH card to purchase fuel and pay for repairs, with the Debtors providing insurance coverage. The Employees are then charged a personal use fee (payroll deduction) and report personal usage for tax purposes. In 2008, the Automobile Program cost the Debtors $2,385,000  By this Motion, the Debtors seek to continue the Automobile Program in the ordinary course of business, without interruption.

**(iv)    Award Recognition Program.**

133.    The Debtors recognize unique, cost-saving, or other recognition-worthy acts by their Employees through an award recognition program. Through this program, if a manager identifies an Employee that has gone above and beyond their normal employment duties in a positive way, the manager has the right to recognize the Employee with a monetary award. The typical award is approximately $250 - $500 and the average monthly expenditure is approximately $28,500. The Debtors believe this program has been instrumental in maintaining Employee morale, especially during this recent downturn, and believe continuation of the program is in the best interest of the Debtors and their estates.

**(v)    Spending Account Benefit Programs**

134.    In the ordinary course of business, the Debtors provide two flexible spending benefits programs, healthcare spending account and dependent care spending account (together, the "FSAs"). The FSAs were established pursuant to § 125 of the Internal Revenue Code of 1986, as amended. The FSAs permit Employees to assign a portion of their earned income, pre-tax, for either medical expenditures in the "Healthcare Spending Account" or for dependent care expenditures in the "Dependent Care Spending Account". Contributions to FSAs are solely funded by pre-tax deductions from Employee wages. The FSA programs are administered by

Employers Benefit Corporation ("EBC"). Approximately 194 Employees participate in the FSAs, which costs the Debtors less than $12,000 per year to administer.

135. The Debtors withhold from the wages of Employees that participate in the FSA the assigned portion of their income in a Milacron general bank account. EBC notifies the Debtors when a claim is made by a participating Employee against his/her respective FSA contribution. Upon such notification, the Debtors then fund the claim by remitting full payment of the claim to EBC.

136. Currently, the Debtors estimate that there is approximately $75,000 of accrued but unpaid, prepetition liabilities pertaining to the FSA. The Debtors request authority to pay any prepetition amounts due to EBC under the FSA program in the ordinary course of business, and to honor and pay any prepetition amounts related thereto which have been deducted from Employees' wages and is not property of these bankruptcy estates.

137. Additionally, the Debtors offer a Health Savings Account ("HSA") to employees enrolled in the high deductible medical plan. Employees may contribute pre-tax earnings to this account to pay for medical expenses. These funds vest for the benefit of the Employee and may be used at any time, with unused funds paid out upon termination from the program. The funds are deposited into individual Employee accounts at JP Morgan Chase to be held pursuant to the regulations of the program. Approximately 311 Employees participate in the HSA program and contribute a total of $542,000 per month. The Debtors have historically contributed $1,000 per year into the Employees HSA accounts, payable on a quarterly basis. By this Motion, the Debtors seek authorization to continue the HSA program in the ordinary course of business.

**(vi)**  **Employee Assistance Program, Nursing Services, Tuition Assistance, Relocation Assistance, Expatriate Policy and Adoption Program**

138.     The Debtors provide regular full-time hourly Employees with the services of an Employee Assistance Program (the "Employee Program") to provide confidential assistance (as limited by law) with personal issues Employees may have.  The cost of using the self-funded Employee Program is completely paid by the Debtors for the first three in-person consulting sessions as well as for unlimited phone consultation.  The cost  is estimated to be approximately $220 per month.  The cost of any additional assistance is borne solely by the Employee.

139.     The Debtors operate on-site nursing services at certain of their locations (the "Nursing Services").  The Nursing Services provide preventative care by requiring employees to have workplace physicals as well as providing disability administration and return to work programs.  The Nursing Program is administered by Tri-Health and costs approximately $7,350 per month.

140.     The Debtors provide educational and training assistance to Employees (the "Tuition Program").  Although the plan has been suspended for all new requests as of 2008, the Debtors seek to continue honoring its obligations to those Employees attending classes and working toward approved degrees that entered the Tuition Program prior to its suspension.  The average monthly tuition reimbursement is approximately $2,100 per month.

141.     The Debtors offer full time Employees several variations of relocation benefits in the event they require relocation as a result of their employment with the Debtors  ("Relocation Program").  The benefits are administered by SIRVA.  Employee benefits depend upon the level and experience of the Employee that is relocating.  Relocation benefits can be awarded to new hires, transferring employee or employees given foreign assignments.  There are currently no relocations in process or pending.

142.    The Debtors provide certain benefits to Employees that accept foreign service or are deemed subject to a foreign jurisdictions tax ("Expatriate Policy").  Long term benefits include benefits for housing, transportation, cost of living, airfare, children's education, and other benefits, depending upon the specific facts and circumstances of the assignment.  In addition, all Employees covered under the Expatriate Policy receive tax filing services paid for by the Debtors.  The Debtor also pays foreign jurisdiction tax so that the Employee is neither penalized nor rewarded for foreign assignment.  There is currently one employee on foreign assignment.

143.    The Debtors provide all full time Employees with up to $2,500 of eligible expenses related to the adoption of a child ("Adoption Program").  There are currently no Employees participating in the adoption program.

144.    By this Motion, the Debtors request authority to honor, in their sole discretion, their Employee Program, Tuition Program, Relocation Program, Expatriate Policy, and Adoption Program in the ordinary course of business, and to honor and pay any prepetition amounts related thereto.

**(vii)    Benefits Not Addressed By This Motion.**

145.    In addition to the above benefits, the Debtors have in place a number of other policies and programs for the benefit of current and former employees, including severance policies, short term and long term incentive plans, retiree medical plans, and other plans for former Employees.  The Debtors are not seeking authorization from the Court with respect to such programs in this Motion.  The Debtors will seek relief with respect to such programs in other motions, as needed.  As such, this Motion is not intended to prejudice the Debtors' right to seek such relief as the Debtors may deem necessary and appropriate with respect to such programs.

## III. ADMINISTRATIVE FUNCTIONS RELATED TO EMPLOYEE BENEFIT PLANS

146.     As is customary in most large companies, the Debtors utilize the services of several professionals and consultants in the ordinary course of their businesses in order to facilitate the administration and maintenance of their books and records related to certain of the Employee Benefits.    As detailed herein, the Debtors utilize the services of third-party administrators ("TPA's") for the administration and management of their various Employee benefit programs, including but not limited to insurance, nursing services, payroll processing, COBRA processing, the 401(k) Plan, actuarial services related to benefit plans, and the FSA (the "Administration Expenses").    The amount the Debtors pay these professionals and consultants average approximately $170,000 per month.

147.     I believe these administrative services are necessary to the Debtors administration of Employee Benefit Plans and ensure that the Debtors' multiple benefit programs are operated in the most cost-effective and efficient manner.    Accordingly, the Debtors request that they be authorized, but not directed, to pay, in the ordinary course of business, the prepetition Administration Expenses owing to the TPA's identified in the Employee Motion.

## IV. D&O COVERAGE

148.     The Debtors maintain premium-based directors and officers' liability insurance policies and excess liability polices (collectively, the "D&O Policies").    The D&O Policies include primary insurance provided by XL.    The primary insurance provides a limit of $15 million with retention requirements of $500,000 for each SEC claim and $350,000 for other claims.    In addition to the primary policy, the Debtors maintain excess insurance for an additional $10 million in coverage through Axis, $5 million through Navigators, $10 million

through XL, $5 million through Navigators, and $5 million through Monitor (Berkley), for a total of $50 million in layered insurances.

149.     As of the Commencement Date, the Debtors do not believe they owe any prepetition premiums on the D&O Policies.  However, the Debtors request to continue the D&O Policies and pay any prepetition amounts outstanding, if any, in their sole discretion and in the ordinary course of business.

## V.     DIRECTION TO BANKS

150.     Finally, the Debtors seek an Order authorizing and directing all banks to receive, process, honor and pay any checks, direct deposits and or wire transfers drawn upon the Debtors' payroll and general disbursement accounts related to Employee Wages and Benefits, FSA's or Administrative Expenses, whether presented before or after the Commencement Date, provided that such funds are on deposit in the applicable amounts to cover such payments.

### h)     Motion For Entry Of An Order Pursuant to Bankruptcy Code Section 105, 363, 364, 1107 and 1008, and Bankruptcy Rule 6003 Authorizing Debtors to Maintain Insurance Policies, Pay Insurance Obligations, and Renew Insurance Policies

151.     Under the above-referenced "Insurance Motion", the Debtors seek entry of an order authorizing, but not directing, the Debtors to: (a) maintain their various insurance policies (collectively, the "Insurance Policies") and to pay all premiums, brokers' fees, administrations fees, and consulting fees, (the "Insurance Obligations"), arising under or in connection with the Insurance Policies which the Debtors have obtained through several third-party insurance carriers (collectively, the "Insurance Carriers"), including any Insurance Obligations for prepetition periods, and (b) enter into new insurance policies, to replace policies provided by the Debtors' wholly-owned captive insurance provider, Milacron Assurance Limited (Bermuda) ("MAL")  or otherwise, as the Debtors, in their discretion, deem necessary and appropriate to provide adequate insurance coverage.

**(i).    Insurance Policies and Obligations**

152.    In connection with the operation of their businesses and management of their properties, the Debtors maintain numerous Insurance Policies. As set forth in Exhibit A attached to the Insurance Motion, the Insurance Policies include coverage for, among other things, commercial general liability, property, non-owned aircraft liability, auto liability, employers liability, directors' and officers' liability, fiduciary liability, workers' compensation, environmental impairment liability, umbrella liability coverage, and other miscellaneous coverage. The third-party claims that are covered by the Insurance Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtors.

153.    The Debtors have historically been, in part, directly insured through a captive insurance program by a wholly owned subsidiary of Milacron Inc., MAL, for commercial liability insurance, deductible reimbursement, environmental impairment liability, inland marine, ocean cargo, Ohio Workers' Compensation and Medical Stop Loss insurance.  The Debtors are currently in the process of reviewing the need for certain of the insurance provided by MAL, and where necessary, identifying alternatives to MAL in the marketplace and procuring replacement insurance where the terms are reasonable and provide substantially similar coverage to that previously provided by MAL.  The Debtors believe moving certain of the insurance policies to independent third-party providers is in the best interest of all interested parties.

154.    To the extent that any Insurance Policy premiums or losses paid on Debtors' behalf and billed to Debtors' pursuant to the large deductible auto liability policies provided by Travelers Insurance Companies (and CNA Insurance Companies in the past) may be attributed to prepetition insurance coverage, I believe that payment of such Insurance Policy premiums is necessary to ensure continued coverage under such Insurance Policies and to maintain good

relationships with the Debtors' insurers. Similarly, the Debtors' believe that continued payment of Insurance Policy premiums as such premiums come due in the ordinary course of the Debtors' business is necessary. The Debtors' maintenance of their relationships with their insurers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such Coverage.

155. As of the Commencement Date, the Debtors do not believe there are any outstanding premiums in connection with the Insurance Policies except to the extent of new policies to replace the coverage provided by MAL. As described herein, continuation of the insurance coverage and insurance policies is essential to the ongoing operations of the Debtors' businesses. Accordingly, the Debtors intend to maintain appropriate levels of insurance with respect to the aforementioned categories of insurance policies at all times. Accordingly, I believe the relief requested in the Insurance Motion is in the best interest of the Debtors' estates and other parties in interest.

### (ii). The Debtors' Letters of Credit to Support Risk Management

156. In addition to the Insurance Policies, the Debtors have issued Letters of Credit to secure certain loses, duty payments, and operating expenses. In view of the importance of maintaining insurance coverage with respect to these business activities, I believe it is in their best interest, and the best interest of the parties in interest to maintain these Letters of Credits in place and honor all obligations under the insurance contracts.

### i) Motion of the Debtors for an Order Authorizing, on an Emergency Basis, Payment of Certain prepetition Claims of Critical Vendors

157. Under the above-referenced "Critical Vendor Motion", the Debtors seek entry of an order authorizing the Debtors, on an emergency basis, in their discretion, to pay the

prepetition claims of critical vendors that delivered goods or provided services to the Debtors before the Commencement Date.

158.    Certain vendors (the "Critical Vendors"): (a) have claims for providing (i) essential goods to the Debtors that were received by the Debtors before the Commencement Date and/or (ii) essential services that were rendered to, or on behalf of, the Debtors before the Commencement Date, and/or (b) are foreign vendors that may not have the same understanding or customs with respect to the bankruptcy process (collectively, the "Critical Vendor Claims").

159.    I believe payment of the Critical Vendor Claims is vital to a successful bankruptcy proceeding because the Critical Vendors are, in many instances, the only source from which the Debtors can procure certain goods and services, the goods are specifically engineered pursuant to the Debtors' needs, or a change in supplier would unreasonable delay the timeframe and price at which the Debtors could provide their customers with goods and services. A failure to pay the Critical Vendor Claims is likely to result in many of the Critical Vendors unable or unwilling to provide goods and services to the Debtors postpetition, and may force the Debtors to obtain such goods and services elsewhere at a higher price or not of the quantity or quality required by the Debtors.

160.    The Debtors have examined whether the payment of Critical Vendor Claims is necessary and will ensure that the Debtors have access to adequate amounts of trade credit on a postpetition basis. Specifically, the Debtors have reviewed their accounts payable and undertaken a process to identify those vendors who are absolutely essential to the Debtors' operations. The Debtors have further developed procedures (for which they seek this Court's approval) that, when implemented, will ensure that vendors receiving payment of Critical

Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis.

161.    The Debtors consulted with appropriate members of their management team to identify those vendors that are most likely essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether certain customizations or other unique factors prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (c) whether a customer directs the use of a certain vendor as a condition of their purchasing, (d) whether the vendor is a foreign entity and the customs of the vendor, with respect to bankruptcy, is likely to disrupt the Debtors supply chain and business operations, (e) if a vendor is not a sole source or customer directed provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured, and (f)  whether a vendor meeting the standards of (a), (b) or (c) is likely to refuse to continue providing goods or services to the Debtors postpetition if its prepetition balances are not paid.

162.    After carefully assessing the universe of vendors against the foregoing criteria, the Debtors identified certain parties as critical vendors and estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors in calculating the Critical Vendor Cap.

163.    The Critical Vendors provide the Debtors with, among other things, specialized equipment and chemicals necessary to their ongoing manufacturing operations.  Failure to continue to obtain the products and in some instances, related services, will have a severe effect on the Debtors' ability to operate post-petition.  In many instances, these products are custom designed and the expense and time associated with identifying alternative suppliers and getting

new supplies up to speed would prove highly disruptive and have substantial negative effects on the Debtors. Other Critical Vendors are the only suppliers of the specific products or services they provide, and finding an alternative supplier may prove impossible. Accordingly, I believe the payment of Critical Vendors and continuation of the terms they provide is necessary to the successful reorganization of the Debtors.

**j) Motion of the Debtors for Entry of an Order Establishing Bar Date for Filing Requests for Payment of Administrative Expense Claims Under Section 105 and 503(B)(9) of the Bankruptcy Code and Approving Form, Manner, and Sufficiency of Notice of the Bar Date Pursuant to Bankruptcy Rule 9007**

164.     Under the above-referenced "Administrative Bar Date Motion", the Debtors seek an order establishing the Section 503(b)(9) Bar Date as the date that is sixty days after the service and publication of the 503(b)(9) Bar Date Notice and authorizing the Debtors to implement procedures for the filing of Section 503(b)(9) Claims.

165.     The Debtors received goods in the ordinary course of business prior to the Commencement Date. I have been informed by counsel that, without approval of this Motion, numerous vendors that delivered goods to the Debtors during the 20 days prior to the Commencement Date will seek allowance of Section 503(b)(9) Claims by filing adversary proceedings against the Debtor.

166.     The Debtors seek approval of the Section 503(b)(9) Bar Date and related procedures that would, among other things, permit an expeditious determination of the Section 503(b)(9) Claims. In addition, the Debtors respectfully request that the Court approve the notice procedures set forth herein designed to apprise holders of potential Section 503(b)(9) Claims that if they fail to file a request for payment of such claims on or before the Section 503(b)(9) Bar Date, such holders will be forever barred and estopped from asserting their Section 503(b)(9) Claims against the Debtors and/or their estates.

**k)  Motion of the Debtors and the Debtors in Possession for an Order Authorizing the Debtors to Pay Prepetition Sales, Franchise, Use and Other Taxes Pursuant to Section 105(a) of the Bankruptcy Code**

167.    Under the above-referenced "Tax Motion", the Debtors seek entry of an order pursuant to section 105 of the Bankruptcy Code that authorizes, but does not direct, the Debtors to pay undisputed prepetition sales, use, franchise, and other tax obligations and other governmental charges and assessments owed to the appropriate taxing authorities (the "Taxing Authorities") in the ordinary course of business, on an unaccelerated basis, as payments become due and payable.  To the extent that a check issued prior to the Commencement Date has not cleared the bank as of the Commencement Date, the Debtors also seek entry of a order (i) authorizing the Debtors' banks to honor such checks and/or any prepetition wire transfer requests and (ii) authorizing the Debtors to issue replacement checks, submit replacement fund transfer requests or provide other means of payment to the Taxing Authorities to the extent necessary to pay all undisputed prepetition sales, use and franchise tax obligations.

168.    In connection with the normal operation of their business, the Debtors incur franchise and other taxes and fees and collect sales and use taxes from their customers and other third parties (collectively, the "Taxes") on behalf of various taxing authorities for payment to such authorities.  The Debtors pay the Taxes to the various Taxing Authorities on a monthly, quarterly or yearly basis, depending on the particular Tax, as such payments become due and payable.

169.    As of the Commencement Date, the Debtors' financial records indicate that the Debtors are substantially current on their payment of Taxes to all Taxing Authorities.  Therefore, the Debtors seek this relief out of an abundance of caution and to the extent that any Taxes accrued prepetition were not paid prepetition, paid in an amount that is less than actually owed,

or if any payments sought to be made prepetition are rejected, lost or otherwise not received in full by any Taxing Authority.

170.    I believe that the failure to pay the Taxes could have a material adverse impact on the Debtors ability to operate in the ordinary course of business and could result in the Debtors' officers and directors being held personally and/or criminally liable for the failure to pay the Taxes.  Furthermore, the Debtors believe that the Taxing Authorities may cause the Debtors to be audited if certain of the Taxes are not paid, and such audits will unnecessarily divert the Debtors' attention from their business operations and reorganization.  The payment of the Taxes is also necessary to avoid potential administrative difficulties.  Withholding of payment of the Taxes will likely cause the Taxing Authorities to take immediate action, including an increase in state audits and lien filings or motions for relief from stay.  Prompt and regular payment of the Taxes will help avoid these unnecessary government actions.

171.    In addition, I am informed by counsel that the Taxes may be afforded priority status under section 507(a)(8) of the Bankruptcy Code, and therefore, such taxes and fees must be paid in full as a condition to confirmation of any plan of reorganization.  Accordingly, the payment of the taxes and fees affects the timing of the payment and should not prejudice the rights of other creditors or reduce the ultimate distribution to such creditors.  Further, to the extent that the Debtors have collected sales and use taxes from their customers and such funds must be held in trust by the Debtors for the benefit of the Taxing Authorities, such monies may not constitute property of the Debtors' estates.

172.    Accordingly, I respectfully submit that the payment of the taxes and fees is necessary for the continued operation of the Debtors' business.

**l)    Debtors' Emergency Motion for Entry of an Order Under 11 U.S.C. §§ 105, 362, and 541 and Fed. R. Bankr. P. 3001 and 3002 (A) Limiting Certain Transfers of**

**Equity Interests of the Debtors and Certain Claims Against the Debtors and (B) Approving Related Notice Procedures**

173.     By the above-reference "NOL Motion", the Debtors request that this Court order that certain notice and waiting periods govern certain transfers of equity interest in and of the Debtors and certain worthless stock deduction claims.  This will provide the Debtors with advance notice of certain transactions that may jeopardize their NOLs, and will enable the Debtors, if necessary, to obtain substantive relief from this Court to protect their NOLs. The limited relief requested in this Motion will enable Debtors to closely monitor certain transfers of equity and worthless stock deduction claims, and ensure that the Debtors are in a position to act expeditiously to prevent such transfers and claims if necessary, and thus allow the Debtors to protect and preserve their NOLs. Specifically, the Debtors request that the Court enter an Order approving the procedures set forth on Exhibit A to the NOL Motion.

174.     The Debtors have had significant operating losses in the recent past ("NOLs"). The Debtors' NOLs are an extremely valuable asset because, as I have been informed by counsel, under the Internal Revenue Code (the "IRC"), the Debtors can carry forward their NOLs to offset their future taxable income for up to 20 taxable years and thereby reduce their future aggregate tax obligations.

175.     The Debtors' NOLs are currently estimated to be approximately $225,500,000, which, based on the 35% federal corporate tax rate now in effect, are worth approximately $78,925,000 in potential future federal income tax savings.  Additional state tax savings may also be available by utilizing Debtor's NOLs.  These tax savings -- and the accompanying increase in the Debtors' cash flow -- are a valuable asset to the estate.  I have been informed by counsel that one bankruptcy court has recognized, "[W]hat is certain is that the NOL has a potential value, as yet undetermined, which will be of benefit to creditors and will assist [the

debtors] in their reorganization process. This asset is entitled to protection while [the debtors] move forward toward their reorganization." See In re Phar-Mor, Inc., 152 B.R. 924, 927 (Bankr. N.D. Ohio 1993).

176.    I have been informed by counsel that a corporation's ability to use its NOLs may be reduced under certain circumstances.  This Motion focuses on two of those circumstances:

a)    If the Corporation Experiences an "Ownership Change." A corporation that undergoes an "ownership change" is limited in the amount of taxable income that it can offset against its NOLs.

b)    "Ownership Change" When 50-Percent Shareholder Claims Worthless Stock Deduction.  An "ownership change" may be deemed to occur on the last day of the tax year in which a "50-percent shareholder" declares its stock in the debtor corporation to be worthless by taking a worthless stock deduction for federal income tax purposes.

177.    I have been informed by counsel that once all or part of a NOL is disallowed under IRC Section 382 its use is limited forever and once a claim for a worthless stock deduction has been made or an equity interest is transferred, the deduction or transfer, as the case may be, cannot be nullified without court action.  Thus, unrestricted transfers of equity securities in and of the Debtors or the taking of the worthless stock deduction by a 50-percent shareholder could hinder the Debtors' reorganization efforts by causing them to lose their ability to use NOLs to offset future taxable income.

178.    Because of the significant potential tax savings (approximately $78,925,000 to be utilized over future years) that will be lost if an "ownership change" occurs, I believe it is necessary to restrict the trading of equity interests in and of the Debtors and the taking of worthless stock deductions to facilitate a successful restructuring.

**m) Motion of Debtors and Debtors in Possession for an Order Authorizing Debtors to Honor and Continue Certain Customer Programs in the Ordinary Course of Business Pursuant to 11 U.S.C. § 105(A) and 11 U.S.C. § 363(B) of the Bankruptcy Code**

179.     By the above-referenced motion (the "Customer Program Motion"), the Debtors seek the entry of an Order that authorizes, but not directs, the Debtors to continue to honor, in their sole discretion, certain customer-related policies including, among others, a warranty program, rebate program, customer return policy, and customer correction policy (collectively, the "Customer Programs") in the ordinary course of their businesses.

180.     In essence, the Debtors desire authority to continue during the postpetition period those beneficial Customer Programs that they believe were cost-effective and beneficial to their business during the prepetition period.  I believe that such relief is necessary to preserve their reputation in the industry and to provide for an opportunity to restructure and rehabilitate the business.  The total operational and administrative cost to the Debtors to continue the Customer Programs is relatively insignificant in comparison to the revenue that such Customer Programs generate.  For the reasons set forth herein, I believe it is in the best interest of the Debtor and their estates to continue, in the ordinary course of their businesses, those of the Customer Programs that they determine to be beneficial as more fully set forth below.

**(i)     Warranty Programs**

181.     The Debtors provide their customers with a warranty program on the products the Debtors sell.  The continuation of this program is necessary to provide the Debtors' customers with confidence in the long term stability of their relationship with the Debtor.  I believe a loss of the warranty program will lead customers to question their relationship with the Debtors and they will likely seek products from other suppliers where they have the confidence that damaged or other unacceptable products will be fixed or replaced, or they will be entitled to monetary compensation for the products.

182.     To fund the Debtors' warranty program, the Debtors have two types of reserves -- "normal" and "extraordinary".  Normal warranty reserves are intended to cover routine costs

associated with the repair or replacement of products sold in the ordinary course of business during the warranty period. These reserves are accrued using a percentage-of-sales approach based on the ratio of actual warranty costs over a representative number of years to sales revenues from products sold with warranties over the same period. Extraordinary warranty reserves are intended to cover major problems related to a single machine or customer order or to problems related to a large number of machines or other type of products. These reserves are intended to cover the estimated costs of resolving any problems based on relevant facts and circumstances.

183.    The Debtors' costs associated with providing warranties to customers have not been significant in recent years. In the year ending December 31, 2008, operations accrued warranty reserves totaling $3.2 million and incurred warranty related costs totaling $4.3 million. The current warranty reserves are approximately $4.0 million (including the reserves of non-debtor European subsidiaries). While the Debtors believe the reserves are adequate, unforeseen problems related to unexpired warranty obligations could result in a requirement for additional reserves in the future.

184.    In addition, the Debtors maintain a Warranty reserve for material quality assurance incidents. The reserve is used to provide customers the confidence they require for ongoing use of the products supplied by the Debtors. In the event of an incident, the Debtors investigate, and if necessary, provide the customer with a credit memo to be used against future purchases. The Debtors maintain a reserve of $95,000 and have approximately $85,000 in unpaid credit memos associated with the quality assurance incidents.

**(ii).    Rebate Programs**

185.    The Debtors provide their customers a rebate program based on certain volume purchasing. With a single exception, where the rebate is order specific, the rebate program is

based on the customer's anticipated buying needs over the course of the year. If the customer's buying volume meets or exceeds a predetermined target agreed to by the customer and the Debtor, the customer may "earn" a credit on future purchases or a cash rebate. The total amount earned in a year is entered as a credit on the customer's account at the end of the year. As of February 2, 2009, the accrued but unpaid rebates for 2008 were approximately $633,700. The Debtors believe the costs of this program is minimal compared to the benefit of increasing overall sales volume on a year-to-year basis.

**(iii).  Credit Memos**

186.    The Debtors issue various credit memos granting customers credits based on product returned or other administrative corrections to account balances. These credits may then be used on future purchases by the customer. The Debtors have a return policy for various of its product lines that permit the customers to return product if it provides unsatisfactory for their needs. The amount of these returns is minimal in comparison to the level of comfort it provides the customers in their purchasing decisions. Similar programs are standard in the industry and failure to provide such a program may lead to customers seeking their needs elsewhere.

187.    In addition, from time to time, the Debtors make administrative errors in shipping product or billing the customers for product delivered. In order to correct these errors, the Debtors will issue credit memos and correct the errors. Although generally the amounts are minimal, I believe the ability of the Debtors to correct errors made prepetition is essential to providing customers with long term confidence in the Debtors. The amount of credit memos generated between returns and administrative errors varies from month to month. As of March 4, 2008, the total amount outstanding on credit memos was approximately $1.5 million. These amounts are recorded against the vendors account and typically credited against future orders, although the vendors may request payment of the outstanding amounts. I believe the ability to

continue these customer programs without interruption is necessary and in the best interest of the parties in interest.

**(iv).    Advance Payments**

188.    The Debtors manufacture large equipment for their customers.    The manufacturing process can be time consuming and have substantial costs of completion.    As a result, the Debtors often require advance payments prior to beginning the manufacture of a piece of equipment and periodic progress payments during the manufacturing process.    With the filing of the bankruptcy, these advance payments are property of the estate, however customers will expect that the payments will be continued to be applied toward the final purchase price of the purchased equipment.    The Debtors ability to complete these products and provide the customers with the equipment they expect in a timely manner and at the agreed to price, is necessary to maintain their goodwill and customer confidence.    Conversely, given the cash constraints associated with the petition and the risks of customers cancelling their orders and demanding their cash back, the Debtors request authority to retain all advance payments as non-refundable deposits.    As of early 2009, the Debtors had approximately $10.8 million in advance payments received from its customers.    The Debtors therefore request authority, in their sole discretion, to treat any prepayments made by their customers as non-refundable deposits and to continue to honor their commitments to the customers with respect to the manufacture of equipment in process.

189.    Because the industry in which the Debtors operate is extremely competitive and sensitive to the particular manufacturing requirements of its customers, the Debtors endeavor to maintain high levels of customer service and satisfaction.    In line with this goal, the Debtors have adopted certain practices and policies designed to foster customer satisfaction.    I believe it is essential to the Debtors' reorganization efforts that the Debtors be permitted to continue such

policies. Accordingly, I respectfully submit that the continuation of Customer Programs is beneficial and in the best interest of the Debtors' estates and other parties in interest.

**n)** **Motion of Debtors for Entry of an Order Authorizing the Debtors to (A) Pay in the Ordinary Course of Business Prepetition Claims of Shippers and Warehousemen and (B) Satisfy United States Customers Duties Imposed on Shipment From Foreign Suppliers and Pre-Petition Obligations of Service Providers in the Debtors' Foreign Supply Chain**

190. By the above-referenced "Shippers, Warehousemen, and Foreign Supply Chain Motion", the Debtors seek the authority to continue to pay, in the ordinary course of business, prepetition claims of Shippers and Warehousemen (each as defined below) who have (or may have) state law remedies available to secure payment of their claims. Additionally, the Debtors seek authorization to pay pre-petition obligations related to the foreign duties, freight forwarders, ocean cargo, foreign inspection and inland freight for international shipments, and to vendors that may have remedies to secure such payments. The Debtors propose payment of such claims when, in the Debtors' sole discretion, nonpayment of such obligations would unduly disrupt the Debtors' business.

**(i).** **Shipping and Warehousing Claimants**

191. As a general rule, the Debtors operate a "just-in-time" inventory system, which means that the Debtors' ability to produce goods depends on the frequent, and often daily, deliveries of materials and goods. As a result, the Debtors employ third parties to ensure that their supply and delivery system runs smoothly, and their inventory and shipments arrive on time, including Shippers and Warehousemen.

192. The Shippers are contracted by the Debtors, and ship, transport, store, and deliver raw materials as well as finished product to the Debtors and their customers. Further, the Debtors contract with independent Warehousemen to store goods which are in transit. Generally, the Debtors pay the Shippers and Warehousemen upon agreed upon terms

193.     I have been informed by counsel that under some state laws, a Shipper or a Warehousemen may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the goods.  In addition, I have been informed by counsel that pursuant to section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection of a valid possessory lien.

194.     The Debtors expect that, as of the Commencement Date, certain of the Shippers and Warehousemen will have outstanding invoices or have accrued but unbilled charges for goods that were delivered to the Debtors or the Debtors' customers prior to the Commencement Date (the "Shipping and Warehousing Charges").  As a result, I believe that certain Shippers and Warehousemen could argue that they are entitled to possessory liens for transportation and storage, as applicable, on the goods in their possession and may refuse to deliver or release such goods before their claims have been satisfied and their liens redeemed.  Indeed, even if the Shippers and Warehousemen did not have a valid lien, their possession (and retention) of the Debtors' goods and materials could severely disrupt, and potentially cripple, the Debtors' operations because of the Debtors' "just-in-time" inventory policy.

195.     The Debtors submit that the total amount to be paid to the Shippers and Warehousemen if the requested relief is granted is minimal compared to the importance and necessity of the Shippers and Warehousemen and the losses the Debtors may suffer if their operations are disrupted.  Moreover, the Debtors do not believe that there are viable timely alternatives to the many Shippers or the Warehousemen they have used prior to the Commencement Date.

**(ii).     Foreign Supply Chain**

196.     In connection with the operation of their businesses, the Debtors receive products from a number of foreign suppliers.  After their manufacture, the products are processed and moved through the Debtors' supply chain by a number of different entities (the "Foreign Supply Chain Service Providers").  Each of these Foreign Supply Chain Service Providers performs a vital service in connection with the products ultimate delivery from the manufacturing facility in the foreign country to the Debtors in the United States.  Each service performed by a Foreign Supply Chain Service Provider is necessary and critical to the Debtors' continued receipt of the products, which itself is critical to the continued operation of the Debtors' businesses.

197.     The foreign supply chain for the Debtors' products operates substantially as follows.  After the products are manufactured they are stored in the foreign jurisdiction until delivered by the various shippers to the port in the country of origin, to be shipped to the United States.  At such port, the freight forwarder prepares the necessary paperwork for shipment of the products from the country of origin to the United States.  The products then are forwarded to the ocean freight companies which ship the products to the United States as ocean freight.  Before the Debtors take possession of the products from their country of origin, however, the shipment must be reviewed for United States customs and duties.  For products not being delivered to a foreign trade zone, the products must comply with the United States Customs Service ("U.S. Customs"), the amount of duties must be established and deposited into the Debtors' account for withdrawal by U.S. Customs, and the Debtors must make a weekly deposit for such duties.  The freight forwarder prepares and processes the documentation needed to clear U.S. Customs for products not entering the foreign trade zone.  The products are then released from U. S. Customs to be moved to the Debtors' or other third party warehouses within the United States.

198.    Upon arrival at the Debtors', or such other third parties warehouses, the products are unloaded from the ocean containers, and are then stored, picked, packed and inventory is taken.  Finally, upon receipt of an order from the Debtors' customer, the products are routed for shipment by the Debtors via inland freight carriers pursuant to the purchase orders received from the Debtors' customers.

199.    The services provided by each Foreign Supply Chain Service Provider is critical to the continued operation of the Debtors' business.  If any of the Foreign Supply Chain Service Providers were to refuse service to the Debtors, the resulting disruption to the Debtors' business would be devastating and seriously threaten if not prevent the Debtors' ability to successfully reorganize.

200.    I believe it is essential to the Debtors' reorganization efforts that the Debtors be permitted to continue to receive the product shipments without interruption.  Any disruption in the flow of these products to the Debtors will significantly diminish the going concern value of the Debtors' businesses to the detriment of all the Debtors' stakeholders.  Each Foreign Supply Chain Service Provider is a vital link in the chain supplying the Debtors with these  products.

201.    Accordingly, I respectfully submit that the relief requested in the Shippers, Warehousemen and Foreign Supply Chain Motion is necessary and in the best interest of the Debtors' estates and other parties in interest.

    **o)  Emergency Motion For Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. § 361, 362, 363 and 364, and (III) Scheduling Final Hearing on the Debtors' Motion to Incur Such Financing <u>on a Permanent Basis Pursuant to Bankruptcy Rule 4001</u>**

202.     Pursuant to the above-referenced "Post-Petition Financing Motion", the Debtors seek entry of interim, and final orders: authorizing them to: (A) obtain post-petition financing and grant security interests, priming liens, and superpriority administrative expense claim status to the DIP Facility Lender; (B) use cash collateral; and (C) grant adequate protection to the holders of existing liens upon the Debtors' assets.

203.     The Debtors have determined that, under the current circumstances, the post-petition financing proposal made by the DIP Facility Lenders is the only option to satisfy the Debtors' urgent financing needs.  The Debtors were unable to obtain proposals for postpetition financing from any third party and, faced with only one option, the Debtors engaged in extensive arm's length negotiations, in good faith, with the DIP Facility Lenders, culminating in the DIP Facilities.

204.     Before deciding to enter into the DIP Facilities, the Debtors and the DIP Facility Lenders engaged in arms' length, good faith negotiations, each with separate and independent counsel and financial advisors experienced in matters of finance and bankruptcy law.  Counsel informs me that any credit extended by the DIP Facility Lenders on or after the Commencement Date pursuant to the terms of the DIP Facilities and an order of this Court approving the DIP Facilities should be accorded the benefits of section 364(e) of the Bankruptcy Code.

205.     Accordingly, the Debtors have determined, in the exercise of their respective best and reasonable business judgment, that the financing to be provided by the DIP Facility Lenders is the only funding available under the circumstances and addresses the Debtors' immediate necessary financing needs while they restructure their business.  The financing available under the DIP Facilities will enable the Debtors, among other things, to avoid the cessation of their

operations, maintain the continuity of their operations pending a conclusion to the bankruptcy process, and maximize the value of their business as a going concern and their related properties.

206.    Unless the Debtors are authorized to obtain the financing requested herein, the Debtors will not have sufficient available sources of working capital to operate their business in the ordinary course of business after the Commencement Date, as the availability of funds under the Revolver Facility will have been or will nearly be exhausted.  The Debtors' ability to maintain business relationships with vendors, suppliers, and customers, to pay their employees, and to otherwise fund their operations, is essential to the Debtors' continued viability and preservation and maintenance of the going concern value of the Debtors' business.

207.    The Debtors believe that the terms of the DIP Facilities and Interim Order are fair, just, and reasonable under the circumstances, and reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Facilities and the Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and the DIP Facility Lenders, with all parties represented by counsel.  Accordingly, the Debtors believe that any credit extended under the terms of the DIP Facilities is extended in good faith by the DIP Facility Lenders.

208.    Given the Debtors' current financial status and the current status of the credit markets, the Debtors are unable to obtain credit that is not secured with priming liens above those of the Senior Secured Notes.  Accordingly, after appropriate investigation and analysis, the Debtors' management has concluded that the DIP Facilities are the best, and only, alternative available under the circumstances that the Debtors currently face.  Counsel has informed me that

Bankruptcy Courts routinely defer to the Debtors' business judgment on most business decisions, including the decision to borrow money.

209.    In the instant case, the Debtors have exercised sound business judgment by seeking advice from their legal and financial advisors in making the determination that the DIP Facilities and related DIP Loan Documents are fair and reasonable and in the best interest of the Debtors' estates.  Accordingly, I respectfully request the Debtors be granted authority under sections 361-364 of the Bankruptcy Code to enter into the DIP Facilities and borrow funds from the Lenders on the basis described in the DIP Facilities.

**p)  Motion to File Signature Pages of the Restructuring Support Agreement, Filed as an Exhibit to the DIP Motion, Under Seal pursuant to Section 107(B) of the Bankruptcy Code, Rule 9018 of the Federal Rule of Bankruptcy Procedures, and ECF Procedure 6**

210.    By the above-captioned "Signature Pages Motion", the Debtors seek the entry of an Order pursuant to section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and ECF Procedure 6, authorizing the Debtors to file the fully executed signature pages of the RSA, which is filed as an exhibit to the DIP Motion, under seal.   The signature pages to the RSA contain confidential commercial information; namely, the amount of Senior Secured Notes held by the respective signatories to the RSA.  I believe public disclosure of the confidential information set forth in the signature pages of the RSA would be detrimental to the signatories thereto.  The Debtors intend to file with the Court a copy of the RSA as an exhibit to the DIP Motion which will include the aggregate face-value of Senior Secured Notes held by the all respective signatories.   Further, the Debtors will disclose the identities of the parties to the RSA in the public filing; however; they simply request that the face-value of Senior Secured Notes held by each of the respective parties to the RSA be redacted for purposes of public disclosure.

211.     The Debtors have filed the RSA with the Court as an Exhibit to the DIP Motion with the amount of Senior Secured Notes held by the respective signatories thereto redacted. Therefore, I respectfully submit that such disclosure is adequate under the circumstances and the relief requested in the Motion be granted.

**q)  Application For An Order Authorizing the Debtors And Debtors In Possession To Employ And Compensate Certain Professionals Utilized in the Ordinary Course of the Debtors' Business**

212.     By the above referenced "Ordinary Course Professionals Application" the Debtors respectfully request that the Court approve the retention, employment and payment of the Ordinary Course Professionals (as defined herein) without requiring the submission of separate retention pleadings and fee applications for each Ordinary Course Professional.

213.     The Debtors' employees, in the day-to-day performance of their duties, regularly call upon certain professionals, including attorneys, accountants, actuaries and consultants (collectively, the "Ordinary Course Professionals"), to assist them in carrying out their assigned responsibilities.   The Ordinary Course Professionals currently utilized by the Debtors are identified on Exhibit A to the Ordinary Course Professionals Application.

214.     The Debtors cannot continue to operate their business efficiently and in accordance with sound business practice unless they are able to retain and pay for the services of the Ordinary Course Professionals.  The operation of the Debtors' businesses would be hindered if the Debtors were required to submit to the Court an application and proposed retention order for each Ordinary Course Professional and if each Ordinary Course Professional was required to apply for approval of its employment and compensation.  Further, I understand some of the Ordinary Course Professionals are unfamiliar with the fee application procedures employed in bankruptcy cases and might be unwilling to work with the Debtors if these requirements are imposed.  The uninterrupted services of the Ordinary Course Professionals are vital to the

Debtors' continuing operations and their ultimate ability to reorganize. More importantly, the cost of preparing and prosecuting these retention applications and fee applications would be significant and unduly burdensome in comparison to the amount of fees generally charged by such Ordinary Course Professionals, all of which would be borne by the Debtors' estates.

215.     Moreover, it is my understanding that a requirement that the Ordinary Course Professionals each file retention pleadings and follow the usual fee application process required of other bankruptcy professionals would burden the Court and the U.S. Trustee's office with numerous fee applications requesting relatively small amounts of money. This Motion proposes a procedure to alleviate such a burden.

216.     Accordingly, I respectfully submit that an order authorizing the Debtors to employ Ordinary Course Professionals, without requiring each to submit fee applications to the Court, is in the best interest of the Debtors

**r)  Application Pursuant to Fed. R. Bankr. P. 2014(a) For An Interim and Final Order Under Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Dinsmore & Shohl As Counsel For the Debtors and Debtors in Possession**

217.     By the above referenced "Dinsmore Application", the Debtors seek to employ and retain the firm of Dinsmore & Shohl LLP ("D&S" or the "Firm") as their counsel with regard to the filing and prosecution of these chapter 11 cases and all related matters, effective as of the Commencement Date. Accordingly, the Debtors respectfully request entry of an order authorizing them to employ and retain the Firm as its general bankruptcy counsel under a general renewing retainer to perform the legal services that will be necessary during these chapter 11 cases.

218.     D&S is well qualified to represent the Debtors. In preparing for these cases, D&S has become familiar with the Debtors' business affairs and many of the potential legal issues that

may arise in connection with these chapter 11 cases. D&S has also acquired knowledge of the Debtors' businesses, financial affairs and capital structure. In selecting D&S as their general bankruptcy counsel, the Debtors considered D&S's intimate knowledge of the Debtors' operations and finances and its expertise and experience in reorganization and bankruptcy law. I understand that D&S has served as counsel to debtors and creditors in various bankruptcy cases. In addition, the D&S attorneys responsible for representing the Debtors in matters related to their reorganization are members of D&S's restructuring, reorganization and bankruptcy department, with substantial experience in a wide range of bankruptcy cases.

219.    The Firm's depth of experience in business reorganizations and its familiarity with the Debtors makes D&S uniquely qualified to deal effectively with the legal issues that may arise in the context of the Debtor's reorganization. Therefore, the Debtors believe that D&S is well qualified to serve as their bankruptcy counsel and that retention of D&S is in the best interests of the estates.

220.    The Firm's services are necessary to enable and assist the Debtors in performing their duties as debtors and debtors in possession relating to the day-to-day operations of the company as well as all bankruptcy specific matters.

221.    Accordingly, I respectfully submit that authorizing the Debtors to employ and retain D&S as attorneys for the Debtors in these chapter 11 proceedings is necessary and in the best interest of the Debtors and their estates.

s)    **Application of the Debtors and Debtors in Possession for an Interim and Final Order Authorizing the Retention and Employment of Rothschild, Inc. as Financial Advisor and Investment Banker to the Debtors Pursuant to Section 327(a) of the Bankruptcy Code**

222. By the above referenced "Rothschild Application", the Debtors seek to employ and retain Rothschild, Inc. ("Rothschild") to perform the services necessary to the successful administration of these chapter 11 cases, as their Investment Banker and financial advisor.

223. Prior to the Commencement Date, the Debtors engaged Rothschild as investment banker and financial advisor pursuant to an engagement letter dated as of January 16, 2009 (the "Engagement Letter"), a copy of which is attached hereto as Exhibit B to the Rothschild Application, to provide certain services to the Debtors related to the formulation, analysis and implementation of various options for a restructuring, reorganization or other strategic alternative relating to the Debtors. As a result, Rothschild has developed a substantial knowledge and understanding of the Debtors' businesses, finances and capital structure. Furthermore, the Debtors have selected Rothschild as their investment bankers in connection with these chapter 11 cases because of the firm's extensive experience and knowledge in financial planning and its extensive experience advising companies in chapter 11 cases. I believe that Rothschild is well qualified to advise them in these chapter 11 cases.

224. The Debtors have selected Rothschild as their investment banker and financial advisor in connection with these chapter 11 cases because of the firm's extensive experience and knowledge in the restructuring arena and its extensive experience advising companies in chapter 11 cases. Rothschild is one of the world's leading independent investment banking groups, with expertise in domestic and cross border mergers and acquisitions, restructurings, privatization advice and other financial advisory services. A private firm with approximately 220 employees in the United States and offices in New York and Washington, D.C., Rothschild is experienced in providing high quality investment banking and financial advisory services to financially troubled companies. Rothschild is highly qualified to advise on strategic alternatives and its

professionals have extensive experience in deals involving complex financial and operational restructurings.  Rothschild is a member of the National Association of Securities Dealers and the Securities Investor Protection Corporation.

225.    Accordingly, I respectfully submit that authorizing the Debtors to employ and retain Rothschild as investment banker and financial advisor for the Debtors in these chapter 11 proceedings is necessary and in the best interest of the Debtors and their estates.

**t)    Application Pursuant to Fed R. Bankr. P. 2014(a) For an Interim and Final Order Under Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Conway, Del Genio, Gries & Co., LLC As Bankruptcy Consultants and Financial Advisors to the Debtors and Debtors in <u>Possession</u>**

226.    By the above referenced "CDG Application", the Debtors seek to employ and retain Conway, Del Genio, Gries & Co., LLC ("CDG") to perform the services necessary to the successful administration of these chapter 11 cases, as Bankruptcy Consultants and Financial Advisors.

227.    The Debtors have selected CDG because of CDG's experience at a national level in matters of this character and its exemplary qualifications to perform  services required in this case.  The retention and employment of CDG is in the best interests of creditors and the best interests of the estate.

228.    CDG is well qualified to serve as Bankruptcy Consultants and Financial Advisors to the Debtors.  CDG specializes in assisting and advising debtors, creditors, investors, and court-appointed officials in bankruptcy proceedings and out-of-court workouts.  [Its services have included assistance in developing/analyzing and evaluating, negotiating, and confirming plans of reorganization and testifying regarding debt restructuring, feasibility, and other relevant issues.]  It is my understanding that CDG has been retained in numerous nationally prominent bankruptcy proceedings.

229. All the services that CDG will provide to the Debtors will be: (i) at the request of the Debtors, (ii) appropriately directed by the Debtors so as to avoid duplicative efforts among the professionals retained in the case, and (iii) performed in accordance with applicable standards of the accounting profession.

230. Accordingly, I respectfully submit that authorizing the Debtors to employ and retain CDG as bankruptcy consultants and financial advisors for the Debtors in these chapter 11 proceedings is necessary and in the best interest of the Debtors and their estates.

**u) Motion of Debtors and Debtors in Possession for an Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC as Noticing, Balloting and Disbursing Agent**

231. By the above-captioned motion (the "KCC Motion"), the Debtors seek authorization to employ Kurtzman Carson Consultants LLC ("KCC") as its noticing, balloting and disbursing agent (the "Agent") in connection with the Debtors' chapter 11 cases pursuant to the terms and conditions of the KCC Agreement for Services (the "KCC Agreement"), a copy of which is annexed to the KCC Motion as Exhibit A. The Debtors propose to retain KCC on the terms and conditions set forth in the KCC Agreement, with the cost of such services to be paid from the Debtors' estates as contemplated by 28 U.S.C. §156(c).

232. The Debtors have thousands of creditors and potential creditors and numerous other parties-in-interest in these chapter 11 cases. Due to the large quantity of creditors that the Debtors have, I have been informed by counsel that it would be impracticable for the Office of the Clerk of the United States Bankruptcy Court for the Southern District of Ohio, Western Division (the "Clerk's Office") to undertake such tasks. Hence, I submit that the engagement of an independent third party to act as agent for the Court is the most effective and efficient manner by which to perform certain tasks, including, but not limited to: (i) providing administrative services and consultation regarding claims management and solicitation; (ii) overseeing the

distribution of solicitation materials; (iii) receiving, reviewing and tabulating ballots; and (iv) providing computer software support and database management; and (v) performing other administrative tasks such as maintaining creditor lists and mailing notices.

233. I believe KCC is well suited to provide these services because KCC is a data-processing firm whose principals and senior staff have in-depth experience in performing noticing, plan balloting, distribution services, and other administrative tasks for chapter 11 debtors. As set forth in the affidavit of Michael Frishberg, Vice President - Corporate Restructuring Services (the "Frishberg Affidavit)," attached to the KCC Motion as <u>Exhibit B</u>, KCC has assisted and advised numerous chapter 11 debtors in connection with noticing, administration of plan votes and other administrative functions related to bankruptcy proceedings and plans of reorganization.

234. The compensation to be provided by the Debtors to KCC for services rendered is set forth in the fee schedule provided to the Debtors as part of the KCC Agreement and is subject to adjustment by KCC at the beginning of each calendar year. The Debtors believe that such compensation is fair and reasonable.[9] A copy of the fee schedule shall be provided to the U.S. Trustee.

235. Accordingly, I believe that the retention of KCC is essential to the operating efficiency of these chapter 11 cases. I further submit that if KCC is not engaged, then the

---

[9] Moreover, I am informed by counsel that as an administrative agent and adjunct of the Court, that KCC is not a "professional" whose retention is subject to approval under Section 327 of the Bankruptcy Code or whose compensation is subject to approval of the Court under Sections 330 and 331 of the Bankruptcy Code. In fact, I have been further informed that this Court has recently approved retention of a claims agent based on similar terms. <u>See</u> In re The Antioch Company, Case No. 08-35741 (S.D. Ohio, Nov. 14, 2008) (Judge Humphrey) approving retention of Epiq Bankruptcy Solutions, LLC as claims, noticing and solicitation agent); <u>In re EaglePicher Holdings, Inc.</u>, Case No. 05-12601 (S.D. Ohio, April 12, 2005 ) (Judge Aug) (approving retention of the Trumbull Group as Claims, Noticing and Balloting Agent pursuant to 28 U.S.C. § 156(c) and Fed. R. Bankr. P. 2002).

Debtors may have to divert substantial resources from their reorganization efforts to administrative tasks related to these cases.

### v) Motion of Debtors and Debtors in Possession For An Administrative Order Establishing Procedures For Interim Compensation and Reimbursement of Expenses of Professionals

236.    By the above referenced "Interim Compensation Motion", the Debtors request the entry of an order authorizing and establishing procedures for the compensation and reimbursement of court-approved professionals (collectively, the "Professionals") on a monthly basis.

237.    It is my understanding, the requested order will streamline the professional compensation process and enable the Court and all other parties to monitor more effectively the professional fees incurred in these chapter 11 cases.

238.    Specifically, the Debtors propose that, except as otherwise provided in an order of the Court authorizing the retention of a particular Professional, the Professionals be permitted to seek interim payment of compensation and reimbursement of expenses in accordance with the Compensation Procedures as detailed in the Interim Compensation Motion.

239.    I understand the Compensation Procedures requested in the Interim Compensation Motion will (a) reduce substantially the burden imposed on the Court by avoiding the need for the immediate review of monthly statements, (b) enable parties in interest to monitor more closely the costs of administration, (c) diminish undue financial burdens on the Professionals and avoid having Professionals fund the costs of the Debtors' reorganization and (d) permit the Debtors to better predict and manage their monthly cash costs.

240.    Accordingly, I respectfully request the entry of an Order establishing the Compensation Procedures, as detailed in the Compensation Procedure Motion, as it is in the best interest of the Debtors and their estates.

**w) Motion of the Debtor for Approval of Cross-Border Insolvency Guidelines Between the United States Bankruptcy Court and the Ontario Superior court of Justice in Connection with Certain Insolvency Proceedings Filed in Canada by Certain of the Debtors**

241.     By the above-referenced "Canadian Protocol Motion", the Debtors respectfully request the entry of an Order, adopting the Guidelines for Court-to-Court Communications in Cross-Border Cases, a copy of which is attached to the Canadian Protocol Motion as Exhibit A, between this U. S. Bankruptcy Court (the "Court") and the Ontario Superior Court of Justice (the "Canadian Court", together with the U.S. Bankruptcy Court, the "Courts") in connection with reorganization proceedings filed in Canada by debtor Milacron Canada Ltd. under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. 36, as amended (the "CCAA").

242.     One of the Debtors is a Canadian corporation that has assets and creditors located within the jurisdictional limits of Canada. The Canadian Debtor is Milacron Canada Ltd. (the "Canadian Debtor").

243.     The remaining Debtors are organized under the laws of various states within the United States (the "U.S. Debtors"). Certain of the U.S. Debtors also have assets and creditors located within the jurisdictional limits of Canada. I have been informed by counsel that the automatic stay provisions of section 362 of the Bankruptcy Code provide a comprehensive stay of all proceedings against the Debtors and their assets located within the jurisdictional limits of this Court. Prior to the filing of their petitions for relief, the Debtors were concerned about assets and creditors that were located outside of the jurisdictional limits of this Court and the provisions of section 362 of the Bankruptcy Code. As a result, the Debtors were concerned with protecting their assets in Canada from creditors who might not otherwise be subject to this Court's jurisdiction. The Debtors, including the Canadian Debtor, have also sought an order

under the *Companies' Creditors Arrangement Act*, R.S.C., 1985, c. C-36 as amended (the "CCAA") granting, among other things, a stay of proceedings (the "Canadian Cases").

244. Given the complex, transnational nature of the Debtors' businesses and the proceedings commenced in this Court and the Canadian Court, I believe that it would be appropriate to implement the Guidelines. The Guidelines would assist the Courts and the Canadian Court in coordinating the insolvency proceedings, which involve the restructuring of six affiliated entities in the United States and Canada.

245. The key issues addressed by the Guidelines include:

- interaction between this Court and the Canadian Court;
- interaction between a duly authorized Foreign Representative and each of this Court and the Canadian Court;
- interaction between the principal constituents in the U.S. and Canadian Cases;
- appearances of parties in the insolvency proceedings;
- filing of materials in the insolvency proceedings; and
- the conduct of joint hearings.

246. Given the importance of the relief requested herein, I respectfully request that the Guidelines be approved on an interim basis immediately on the Commencement Date. I believe the insolvency proceedings will run most efficiently during the critical early days of these cases if the administrative procedures described in the Guidelines are approved without delay. The Debtors further submit that immediate approval and implementation of the Guidelines would benefit all stakeholders in these cases by promoting cooperation, comity, appropriate notice to all interested parties, and the preservation of all parties' existing rights from the outset. Moreover, because the Guidelines provide administrative relief that should not adversely impact any party's substantive rights, the interim approval of the Guidelines on limited notice is appropriate and within this Court's discretion.

**x) Debtors Motion for Entry of an Order Pursuant to 11 U.S.C. § 341 and 28 U.S.C. § 156(c) Authorizing the Debtors to (1) File (A) Consolidated List of Creditors and (B) Consolidated List of Debtors' Top Forty Creditors and (II) Provide <u>Notice, Including Notices of Commencement of Cases and Section 341 Meeting</u>**

247.    The Debtors have identified thousands of entities to which notice of certain proceedings in these chapter 11 cases must be provided. I understand from counsel that such notices will comprise, without limitation, notice of: (a) the filing of the Debtors' voluntary petitions under chapter 11 of the Bankruptcy Code, (b) the initial meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code, (c) applicable bar dates for the filing of claims, (c) the hearing on adequacy of a disclosure statement in respect of a plan of reorganization, and (d) the hearing to confirm a plan of reorganization (collectively, the "Notices").

248.    The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents in these chapter 11 cases. The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents, as contemplated by Local Rule 1007-2.  Accordingly, I believe the authority to file the lists on a consolidated basis, identifying their creditors and equity security holders in the format or formats currently maintained in the ordinary course of the Debtors' businesses, is in the best interest of all parties.

### III.  <u>CONCLUSION</u>

249.    In order to preserve and maximize the value of their business and successfully reorganize, the Debtors' immediate goal is to engage in business as usual following the commencement of these chapter 11 cases.  I believe that, if the Court grants the relief requested in each respective First Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the Debtors' estates, their creditors and other parties in interest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 14th day of March, 2009 at Cincinnati, Ohio.


                    */s/ David E. Lawrence*_____
                    David E. Lawrence
                    President and Chief Executive Officer